# 25-2657

## United States Court of Appeals for the Second Circuit

HOLTEC INTERNATIONAL, HOLTEC INDIAN POINT 2, LLC, HOLTEC INDIAN POINT 3, LLC, HOLTEC DECOMMISSIONING INTERNATIONAL, LLC,

*Plaintiffs-Counter-Defendants-Appellees*,

v.

STATE OF NEW YORK,

*Defendant-Counter-Claimant-Appellant*.

On Appeal from the United States District Court for the Southern District of New York

**BRIEF AND SPECIAL APPENDIX FOR APPELLANT**


BARBARA D. UNDERWOOD
*Solicitor General*
ESTER MURDUKHAYEVA
*Deputy Solicitor General*
PHILIP J. LEVITZ
*Senior Assistant Solicitor General*
*of Counsel*

LETITIA JAMES
*Attorney General*
*State of New York*
Attorney for Appellant
28 Liberty Street
New York, New York 10005
(212) 416-6325


Dated: January 26, 2026

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......... iii

PRELIMINARY STATEMENT .......... 1

JURISDICTIONAL STATEMENT .......... 3

ISSUES PRESENTED .......... 3

STATEMENT OF THE CASE .......... 4

A. Legal Background .......... 4

B. Factual Background .......... 6

C. Procedural Background .......... 9

STANDARD OF REVIEW .......... 11

SUMMARY OF ARGUMENT .......... 11

ARGUMENT .......... 13

POINT I

THE DISTRICT COURT APPLIED AN INCORRECT STANDARD THAT EXTENDED FIELD PREEMPTION BEYOND THE AREA STATUTORILY RESERVED TO THE FEDERAL GOVERNMENT .......... 16

A. The District Court Erroneously Extended Field Preemption Beyond Core Nuclear Safety Matters .......... 16

B. The District Court Incorrectly Concluded That the Challenged State Law Regulates a Core Nuclear Safety Matter .......... 21

C. Even State Regulations of Core Activities Are Not Preempted If Enacted for Nonsafety Purposes. .......... 24

**Page**

POINT II

NEW YORK'S STATUTE SURVIVES PREEMPTION HERE EVEN UNDER THE DISTRICT COURT'S STANDARD BECAUSE IT HAS NO DIRECT AND SUBSTANTIAL EFFECT ON DECISIONS CONCERNING NUCLEAR SAFETY........................ 26

CONCLUSION ............................................................................... 31

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Boldt v. Northern States Power Co.*,
195 F. Supp. 3d 1057 (D. Minn. 2016) .......... 30

*Cangemi v. United States*,
13 F.4th 115 (2d Cir. 2021) .......... 7

*Cox v. Duke Energy Inc.*,
876 F.3d 625 (4th Cir. 2017) .......... 29

*English v. General Elec. Co.*,
496 U.S. 72 (1990) .......... 20-21, 27

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
725 F.3d 65 (2d Cir. 2013) .......... 13-14, 21, 24, 28

*Kee v. City of New York*,
12 F.4th 150 (2d Cir. 2021) .......... 11

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996) .......... 13

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. 1 (2022) .......... 18

*New York State Trawlers Ass'n v. Jorling*,
16 F.3d 1303 (2d Cir. 1994) .......... 14

*Pacific Gas & Elec. Co. v State Energy Res. Conservation & Dev. Comm'n*,
461 U.S. 190 (1983) .......... passim

*Pennsylvania v. Lockheed Martin Corp.*,
684 F. Supp. 2d 564 (M.D. Pa. 2010) .......... 18

*Shieldalloy Metallurgical Corp. v. Nuclear Regul. Comm'n*,
707 F.3d 371 (D.C. Cir. 2013) .......... 22

**Cases** **Page(s)**

*United States v. Manning*,
527 F.3d 828 (9th Cir. 2008) .......... 29-30

*Vermont Teddy Bear Co. v. 1-800 Beargram Co.*,
373 F.3d 241 (2d Cir. 2004) .......... 11, 28

*Vermont Yankee Nuclear Power Corp. v. Entergy Nuclear Vt. Yankee, LLC*,
683 F.3d 1330 (Fed. Cir. 2012) .......... 18, 29

*Virginia Uranium, Inc. v. Warren*,
587 U.S. 761 (2019) .......... passim

*Williams v. BHI Energy I Power Servs., LLC*,
No. 21-cv-1186, 2023 WL 5403796 (D. Minn. Aug. 24, 2023) .......... 18

*Young v. United Parcel Serv., Inc.*,
575 U.S. 206 (2015) .......... 24

**Statutes**

*Federal*

42 U.S.C.
§ 2021 .......... passim
§ 5841 .......... 4

*State*

Environmental Conservation Law
§ 30-101 .......... 8, 25
§ 30-103 .......... 1, 7

**Rule**

Fed. R. App. P. 4 .......... 3

**Miscellaneous Authorities** **Page(s)**

H.R. Rep. No. 86-1125 (1959) ........................................................ 5, 17, 24

S. Rep. No. 86-870 (1959) .............................................................. 5, 17, 24

U.S. Nuclear Regul. Comm'n, *Frequently Asked Questions About Indian Point Effluent Releases: How Do Radioactive Effluent Releases Impact the Public?* (Oct. 2, 2025), https://www.nrc.gov/info-finder/reactors/ip3/faq.................................. 7

## PRELIMINARY STATEMENT

In 2023, the State of New York enacted a statute prohibiting the "discharge [of] any radiological substance into the Hudson River in connection with the decommissioning of a nuclear power plant." Environmental Conservation Law (E.C.L.) § 30-103. Plaintiff Holtec[1], which is federally licensed to decommission the retired Indian Point nuclear plant, sued the State, asserting that the statute is preempted by federal law. The U.S. District Court for the Southern District of New York (Karas, J.) granted Holtec's motion for summary judgment and held that New York's statute falls into the field of exclusive federal regulation covered by the federal Atomic Energy Act (AEA), 42 U.S.C. § 2011 et seq. This Court should reverse.

*First*, the district court applied an incorrect legal standard to the question of field preemption under the AEA. Most fundamentally, the district court erroneously concluded that field preemption could apply whether or not the state law regulates a core nuclear safety matter

---

[1] Plaintiffs Holtec International, Holtec Indian Point 2, LLC, Holtec Indian Point 3, LLC, and Holtec Decommissioning International are referred to collectively as "Holtec" in this brief.

enumerated in 42 U.S.C. § 2021(c), notwithstanding Supreme Court case law explaining that the field of exclusive federal regulatory authority is limited to those core matters. The district court's doctrinal error is particularly stark here because the discharges at issue involve waste-water that in fact poses no radiation threat and a state statute enacted to protect property values and economic development, a core economic police power within the States' traditional authority. Indeed, the AEA expressly preserves state authority to regulate for such purposes, which are "purposes other than protection against radiation hazards." 42 U.S.C. § 2021(k). At a minimum, Holtec did not meet its heavy burden—which the district court did not even acknowledge—to demonstrate that the state statute *clearly* regulates a matter statutorily reserved to the federal government.

*Second*, even under the field preemption standard the district court applied, there was no basis to find preemption. The district court held that a state law is field preempted pursuant to the AEA if the state law has a "direct and substantial effect" on decisions concerning nuclear safety. But the state law at issue merely prohibits discharging into one location (the Hudson River) wastewater that undisputedly poses no

radiological threat. Accordingly, Holtec has not met its burden to show that the law affects decisions concerning nuclear safety—much less directly and substantially.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over the federal claim at issue pursuant to 28 U.S.C. § 1331. This Court has jurisdiction over this appeal from the district court's final judgment pursuant to 28 U.S.C. § 1291. The state defendants' notice of appeal of the district court's October 17, 2025, final judgment is timely because the notice was filed on October 20, 2025. *See* Fed. R. App. P. 4(a)(1)(A).

## ISSUES PRESENTED

1. Did the district court err in applying a legal standard that extended field preemption beyond the core nuclear safety matters statutorily reserved to the federal government?

2. Did the district court err in concluding that the challenged state law directly and substantially affects decisions concerning nuclear safety here?

## STATEMENT OF THE CASE

### A. Legal Background

In 1954, Congress passed the Atomic Energy Act (AEA), 42 U.S.C. § 2011 et seq. The statute granted the federal government, through the Nuclear Regulatory Commission (NRC),[2] broad authority to regulate nuclear energy production. The AEA contains no express preemption provision. *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 768 (2019) (plurality op.).

In 1959, Congress amended the AEA to expand the responsibilities of the States with respect to regulation of certain nuclear material, including byproduct material. *See* 42 U.S.C. § 2021(a)-(b). However, Congress directed the NRC to retain exclusive authority with respect to four core areas: (i) "construction and operation" of a nuclear production, utilization, or enrichment facility; (ii) export or import of nuclear material; (iii) disposal of nuclear material "into the ocean or sea"; and (iv) disposal of other nuclear material that the NRC "determines by regulation or

[2] The relevant predecessor agency in 1954 was the U.S. Atomic Energy Commission. In 1974, Congress abolished the Atomic Energy Commission and transferred its regulatory authority to the NRC. *See* 42 U.S.C. § 5841(f).

order should, because of the hazards or potential hazards thereof, not be so disposed of without a license from the Commission." *See id.* § 2021(c). Congress retained federal authority over these discrete areas principally "because of their special hazards." H.R. Rep. No. 86-1125, at 10 (1959); S. Rep. No. 86-870, at 10 (1959).

The amended statute specified that "[n]othing in this section shall be construed to affect the authority of any State or local agency to regulate activities for purposes other than protection against radiation hazards." 42 U.S.C. § 2021(k). This provision was "intended to make it clear that the bill does not impair the State authority to regulate activities of [NRC] licensees for the manifold health, safety, and economic purposes other than radiation protection." H. Rep. No. 86-1125, at 12; S. Rep. No. 86-870, at 12.

## B. Factual Background

In November 2020, the Holtec plaintiffs received approval from the NRC to decommission the retired Indian Point nuclear energy facility in Westchester County, New York. (Joint Appendix (J.A.) 1553-1554.) The decommissioning requires, among other things, disposing of wastewater remaining from past power plant operations. (J.A. 1556.) That wastewater is treated to remove radioactive material, though an extremely small trace amount of a radioactive material called tritium cannot practically be removed, and thus necessarily remains in the water at the time of disposal. (J.A. 1556.)

The trace amount of tritium in the wastewater at issue is well below limits for safe radiation exposure: the maximum total public radiation exposure from the wastewater was calculated in 2023 (the latest data in the record) to be .0246 millirem, or about one thousandth of the 25 millirem safe exposure limit established by the U.S. Environmental Protection Agency. (*See* J.A. 1653 (citing 40 C.F.R. 190.10); *see also* J.A. 1557 (Holtec acknowledgment that radiation exposure from its wastewater would be "well within the federal limits on radiological discharges").) The .0246 millirem exposure level from the wastewater is

roughly 1000 times less radiation than typical annual terrestrial radioactivity exposure and typical annual cosmic radiation exposure at sea level. And it is roughly 10,000 times less radiation than annual radon exposure in an average U.S. home. A single x-ray of the upper gastrointestinal area exposes a person to roughly 25,000 times as much radiation.[3]

In early 2023, Holtec announced plans to dispose of its wastewater into the Hudson River. Later that spring, the New York Legislature passed a statute providing that "[t]o the extent not subject to preemption by federal law, . . . it shall be unlawful to discharge any radiological substance into the Hudson River in connection with the decommissioning of a nuclear power plant." E.C.L. § 30-103. In August 2023, Governor Kathy Hochul signed the bill into law. (J.A. 1917-1918.)

The purpose of the law was not to address concerns about radiological safety. The legislative findings supporting the statute instead

---

[3] *See* U.S. Nuclear Regul. Comm'n, *Frequently Asked Questions About Indian Point Effluent Releases: How Do Radioactive Effluent Releases Impact the Public?* (Oct. 2, 2025), https://www.nrc.gov/info-finder/reactors/ip3/faq. The Court may take judicial notice of information from this government website. *See, e.g.*, *Cangemi v. United States*, 13 F.4th 115, 124 n.4 (2d Cir. 2021).

provided only that "discharges into waters of the state of radiological agents from nuclear power plants have various adverse and substantial economic impacts on the state and its residents." E.C.L. § 30-101(1). Accordingly, the purpose of the law was to address community concern about "the economic impacts on local real estate values and economic development with respect to the discharge of waste from nuclear power plants into waters of the state during plant decommissioning." *Id.* § 30-101(2). (*See also* J.A. 1925 (memorandum in support from Senator Peter Harckham), 1928 (memorandum in support from Assemblymember Dana Levenberg).) The legislative history likewise reflects concern that negative public perceptions about discharges from a nuclear facility into the Hudson River could harm local real estate values and economic development, regardless of the radiological safety of those discharges. (*See, e.g.*, J.A. 854, 1339, 1357, 1373.)[4]

---

[4] An earlier-introduced Senate bill had sought to more broadly prohibit radiological discharges in any New York State waters based on economic impacts as well as asserted possible health risks, but that bill was not enacted. (*See* J.A. 46, 48-49.)

## C. Procedural Background

In April 2024, Holtec initiated this action against the State, seeking a declaration that the state statute prohibiting discharges into the Hudson River is preempted by federal law. (J.A. 12-21.) The State answered and counterclaimed, asserting that various discharges made by Holtec violated state law. (J.A. 22-40.) The parties then cross-moved for summary judgment.

In September 2025, the U.S. District Court for the Southern District of New York (Karas, J.) granted Holtec's motion for summary judgment and denied the State's cross-motion. The district court concluded that the New York law is field preempted pursuant to the federal AEA.

The district court adopted a "two-part test" for field preemption that has never been articulated by this Court or the Supreme Court. "First, if a state law regulates a core activity described in 42 U.S.C. § 2021(c), the state law is preempted only if it was enacted for the purpose of addressing nuclear safety." (Special Appendix (S.A.) 15 (citing *Virginia Uranium*, 587 U.S. at 769-73 (plurality op.)).) "Second, regardless of whether the state law regulates a core activity, it can still be preempted if it has a 'direct and substantial effect' on the radiological safety decisions of those

who construct or operate nuclear facilities." (S.A. 15 (quoting *English v. General Elec. Co.*, 496 U.S. 72, 85 (1990)).)

Applying this novel test, the district court found that the state law is not field preempted under the first "prong" of the test, but is field preempted under the second, effect-based "prong." The court concluded that the state law regulates the core activity of disposal of nuclear material that the NRC "'determines by regulation or order should, because of the hazards or potential hazards thereof, not be so disposed of without a license from the [NRC]." (S.A. 17 (quoting 42 U.S.C. § 2021(c)(4)); *see* S.A. 15-18.) However, the court agreed with the State that the state law was not enacted for the purpose of addressing nuclear safety, but rather for the economic purpose of protecting property values and economic development around the Hudson River. (S.A. 19-25.) Nevertheless, the district court concluded that the state law is field preempted under the second, effect-based prong of its test, on the assumption that, "[b]y requiring Holtec to change the method by which it disposes of tritiated water," the law necessarily "directly and substantially effects decisions concerning radiological safety levels." (S.A. 29.)

## STANDARD OF REVIEW

This Court reviews a district court's summary judgment decision de novo. *Kee v. City of New York*, 12 F.4th 150, 157 (2d Cir. 2021). In doing so, the Court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Id.* at 158 (quotation marks omitted). "It is the movant's burden to show that no genuine factual dispute exists." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). Summary judgment is inappropriate when the admissible materials in the record make it at least "arguable" that the nonmovant's claim or defense has merit. *See Kee*, 12 F.4th at 158 (quotation marks omitted).

## SUMMARY OF ARGUMENT

I. The district court erred in applying an incorrect legal standard that extended field preemption beyond the area statutorily reserved to the federal government, and holding that New York's law is field preempted under that standard. At the outset, the court was wrong to hold that field preemption could apply regardless of whether the state law impermissibly regulates an activity carved out for exclusive federal

regulation. (*See* S.A. 15.) The Supreme Court has been clear that the field of exclusive federal regulation under the AEA is defined by the core nuclear safety matters set forth in 42 U.S.C. § 2021(c). *See, e.g.*, *Virginia Uranium*, 587 U.S. at 769, 772 (plurality op.); *id.* at 783 (Ginsburg, J., concurring). Moreover, the AEA expressly preserves state authority over regulation for "purposes other than protection against radiation hazards." 42 U.S.C. § 2021(k). Thus, the Supreme Court has upheld against a field preemption challenge a state law enacted for economic purposes, even though it restricted construction of nuclear power plants, an activity closely linked to nuclear safety. *See Pacific Gas & Elec. Co. v State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 216 (1983); *see also Virginia Uranium*, 587 U.S. at 788-89 (Ginsburg, J., concurring). That result governs here. The district court appears to have erroneously concluded otherwise by failing to apply, or even recognize, the heavy burden on Holtec, as the party claiming preemption, to show how a particular federal statutory provision manifests a clear intent to displace the State's traditional police power authority to enact an economic regulation like New York's. *See*, *e.g.*, *Virginia Uranium*, 587 U.S. at 767 (plurality op.); *Pacific Gas*, 461 U.S. at 206.

II. In any event, the district court also erred in finding field preemption under the incorrect legal standard it applied. Holtec did not demonstrate that the challenged state economic regulation has a "direct and substantial effect" (S.A. 25 (quotation marks omitted)) on decisions concerning nuclear safety. While the state law may affect Holtec's decisions about where to dispose of undisputedly safe wastewater, such decisions do not concern the sorts of "safety and 'nuclear' aspects of energy generation" that Congress reserved to the federal government. *Pacific Gas*, 461 U.S. at 211-12. The mere constraint on disposal location could not affect nuclear safety—much less directly and substantially—when Holtec acknowledges that no disposal alternative would be unsafe.

## ARGUMENT

"[B]ecause the States are independent sovereigns in our federal system, [the Supreme Court has] long presumed that Congress does not cavalierly pre-empt state-law." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). "[A]s the Supreme Court has repeatedly instructed, 'in all pre-emption cases . . . we start with the assumption that the historic police powers of the States were not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress.'" *In re Methyl*

*Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 96 (2d Cir. 2013) (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)); *see also New York State Trawlers Ass'n v. Jorling*, 16 F.3d 1303, 1309 (2d Cir. 1994) ("'[S]tates are accorded wide latitude in the regulation of their local economies under the police powers'" (quoting *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976))).

In light of the presumption against preemption, "the party asserting that federal law preempts state law bears the burden of establishing preemption." *In re MTBE*, 725 F.3d at 96 (citing, inter alia, *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 255 (1984)). "Invoking some brooding federal interest . . . should never be enough to win preemption of a state law; a litigant must point specifically to a constitutional text or a federal statute that does the displacing or conflicts with state law." *Virginia Uranium*, 587 U.S. at 767 (plurality op.) (quotation marks omitted). "In this [AEA preemption case] as in any field of statutory interpretation, it is [the court's] duty to respect not only what Congress wrote but, as importantly, what it didn't write." *Id.* at 765.

The district court erred in granting summary judgment to Holtec on field preemption grounds, for at least two independent reasons. First,

the district court applied an incorrect standard by failing to hold Holtec to its burden to show that the state's economic regulation, applied only to undisputedly safe wastewater, clearly regulates a core nuclear safety matter statutorily reserved to the federal government. And, second, the district court erred even under the field preemption standard it did apply, when it concluded that the state law directly and substantially affects decisions concerning nuclear safety.[5]

---

[5] Because Holtec also has pointed to no provision of the AEA with which the state law conflicts, any conflict preemption claim likewise must fail. However, this Court need not separately address conflict preemption because Holtec never made a separate conflict preemption argument below (*see* ECF Nos. 29, 37), and the district court declined to address conflict preemption (*see* S.A. 31).

## POINT I

### THE DISTRICT COURT APPLIED AN INCORRECT STANDARD THAT EXTENDED FIELD PREEMPTION BEYOND THE AREA STATUTORILY RESERVED TO THE FEDERAL GOVERNMENT

### A. The District Court Erroneously Extended Field Preemption Beyond Core Nuclear Safety Matters.

The AEA contains no express preemption provision. *See Virginia Uranium*, 587 U.S. at 768 (plurality op.). Although the Supreme Court has recognized that the AEA evinces Congress's intent to occupy the field of nuclear safety regulation, the Court has also made clear that the AEA preserves "the dual regulation of nuclear-powered electricity generation," with States maintaining their "traditional authority" over economic and other police-power matters, such as "licens[ing], land use, ratemaking, and the like," and the federal government maintaining authority only over "the safety and 'nuclear' aspects of energy generation." *Pacific Gas*, 461 U.S. at 211-12.

Accordingly, the AEA expressly provides that the statute should not "be construed to affect the authority of any State or local agency to regulate activities for purposes other than protection against radiation hazards." 42 U.S.C. § 2021(k). As the Supreme Court explained, "subsection (k) might be described as a *non-preemption* clause." *Virginia Uranium*, 587

U.S. at 769 (plurality op.). And the House and Senate reports on subsection (k) are explicit that the preserved state regulatory authority covers all "the manifold health, safety, *and economic* purposes other than radiation protection." H. Rep. No. 86-1125, at 12; S. Rep. No. 86-870, at 12 (emphasis added).

By expressly preserving state regulation "'for purposes other than protection against radiation hazards,'" Congress "underscored the distinction . . . between the spheres of activity left respectively to the federal government and the states." *Pacific Gas*, 461 U.S. at 210 (quoting 42 U.S.C. § 2021(k)). In other words, "§ 2021(k) stakes out the boundaries of the preempted field, *i.e.,* state laws that apply to federally licensed activities and are driven by concerns about the radiological safety of those activities." *Virginia Uranium*, 587 U.S. at 789 (Ginsburg, J., concurring). Courts "have no license to expand those boundaries." *Id.*

The district court's "two-part" standard for field preemption is entirely inconsistent with these legal principles. Specifically, the test adopted by the district court provides that a state law may be field preempted either if (1) it regulates a core activity preserved for exclusive federal regulation in 42 U.S.C. § 2021(c), or (2) it has a direct and

substantial effect on nuclear safety decisions, "regardless of whether [it] regulates a core activity." (S.A. 15.) But the second step "is one step too many," *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 19 (2022).

The district court cited no provision of federal law to support its novel "two-part" test, nor did it explain how *Virginia Uranium* could fairly be read to allow for field preemption "regardless" of whether a state law impermissibly regulates a core activity. Instead, the district court cited an unpublished district court decision from Minnesota (which in fact rejected a field preemption claim), *Williams v. BHI Energy I Power Servs., LLC*, No. 21-cv-1186, 2023 WL 5403796, at *8 (D. Minn. Aug. 24, 2023). Neither the district court's analysis in this case, nor the district court's analysis in *Williams* supports the creation of a two-part test for AEA field preemption.[6]

---

[6] The other two out-of-circuit cases on which the district court relies (S.A. 15) do not even indicate that a state law may be field preempted regardless of whether the state law regulates a core activity carved out by the AEA. *See Vermont Yankee Nuclear Power Corp. v. Entergy Nuclear Vt. Yankee, LLC*, 683 F.3d 1330, 1347 (Fed. Cir. 2012); *Pennsylvania v. Lockheed Martin Corp.*, 684 F. Supp. 2d 564, 586 (M.D. Pa. 2010).

The text of the AEA and the governing Supreme Court cases are clear that field preemption applies *only* if a state law regulates one of the core nuclear safety matters statutorily reserved exclusively to the federal government. It is only those matters over which Congress directed that the NRC "shall retain authority" on an exclusive basis, 42 U.S.C. § 2021(c), while expressly reserving state authority over regulation "for purposes other than protection against radiation hazards," *id.* § 2021(k). Contrary to the district court's suggestion, a mere effect on nuclear safety decisions (even a "direct and substantial" one) is not enough for field preemption if the State is not regulating within a field the federal government has statutorily reserved to itself. Rather, the party claiming preemption must point to a specific statutory provision that "does the displacing" of the challenged state law, by manifesting an intent to occupy a particular area exclusively, *Virginia Uranium*, 587 U.S. at 767 (plurality op.).

The Supreme Court's most recent AEA field preemption decision, *Virginia Uranium*, is instructive. There, in holding that a state law restricting uranium mining was not field preempted, the Court repeatedly referred to the relevant preempted field as the limited core area of

"especially sensitive" nuclear safety regulation reserved to the federal government by Congress in § 2021(c). *Id.* at 769 (plurality op.); *see, e.g.*, *id.* at 772; *id.* at 783 (Ginsburg, J., concurring).

To be sure, the Supreme Court earlier indicated in *English v. General Electric Co.* (before rejecting the preemption claim there) that a state law that was not enacted with the purpose of regulating core nuclear safety matters could, in theory, still fall within the preempted field if the law had a "direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels"—so as to directly regulate core matters of nuclear safety statutorily reserved to the federal government. *See* 496 U.S. 72, 85 (1990). But, contrary to the district court's suggestion (following the Minnesota court) (S.A. 14-15), *English* did *not* hold that field preemption could extend outside the core nuclear safety matters statutorily reserved to the federal government. *English* simply explained that whether a particular state law regulates such core matters is defined in part by reference to the purpose of the state law, and in part by reference to the state law's actual effect. *See* 496 U.S. at 84. But the Court repeatedly reaffirmed that there is no preemption where Congress provided no "clear and manifest

intent" to preempt, i.e., outside the core nuclear safety matters defined in the statute. *Id.* at 83, 86 (quotation marks omitted); *see id.* at 79.

The district court here fundamentally erred in failing to even acknowledge the presumption against preemption and Holtec's heavy burden to demonstrate that Congress clearly intended the preempted field to extend beyond the statutorily defined core nuclear safety matters (see *supra* at 13-14), even though the presumption and burden were prominently explained in the State's summary judgment briefing (*see* ECF No. 35, at 7, 10-11; ECF No. 40, at 5), and undisputed in Holtec's (*see generally* ECF Nos. 29, 37).

### B. The District Court Incorrectly Concluded That the Challenged State Law Regulates a Core Nuclear Safety Matter.

The district court also erred in concluding that the challenged state law—despite its recognized economic purpose—nonetheless regulates a core nuclear safety matter statutorily reserved to the federal government. The district court did not point to any federal statutory provision "clear[ly] and manifest[ly]," *In re MTBE*, 725 F.3d at 96 (quotation marks omitted), displacing the State's economic regulation at issue here.

As the district court appeared to recognize, the state law does not regulate any of the first three core activities statutorily reserved to the federal government in § 2021(c)—two of which Holtec did not ultimately argue were applicable, and the third of which "clearly does not apply," because it applies only to discharge into "the ocean or sea," and no one has contended that the Hudson River is included in that term. (S.A. 15-17 (quotation marks omitted) (citing 42 U.S.C. § 2021(c)(1)-(3)).)

The only core activity that the district court said the state law does regulate is disposal of nuclear material that the NRC "'determines by regulation or order should, because of the hazards or potential hazards thereof, not be so disposed of without a license from the [NRC]." (S.A. 17 (quoting 42 U.S.C. § 2021(c)(4)).) But the district court did not hold Holtec to its burden to show how this "very narrow," *Shieldalloy Metallurgical Corp. v. Nuclear Regul. Comm'n*, 707 F.3d 371, 376 (D.C. Cir. 2013), statutory provision clearly manifests an intent to displace a state law restricting wastewater discharge in a particular location not because of its hazards, of which there are undisputedly none, but because of potential economic effects of the discharge there. Neither Holtec nor the district court pointed to any NRC regulation or order requiring a license for

disposal of the safe wastewater at issue here, as they were required to do. *See* 42 U.S.C. § 2021(c)(4).

The district court appears to have assumed that any byproduct of a licensed nuclear facility like Indian Point is necessarily governed by 42 U.S.C. § 2021(c)(4), regardless of the byproduct's safety. But even putting aside that this assumption fails to hold Holtec to its burden to show a clear and manifest preemptive intent, the assumption also conflicts with the statute because it would make another part of the statute—§ 2021(b)(1)—superfluous. Section 2021(b)(1) specifically authorizes States to take over regulatory authority for nuclear byproduct, while § 2021(c)(4) prohibits States from taking over such authority only for byproduct that the NRC determines by regulation or order should not be disposed of without a license, because of the byproduct's hazards. If all byproduct of any licensed nuclear facility were excluded from state authority by § 2021(c)(4), it would make no sense to include byproduct among the materials over which States could exercise authority in § 2021(b)(1). Indeed, it is axiomatic that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause is rendered

superfluous, void, or insignificant." *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 226 (2015) (quotation marks omitted).

The better reading, consistent with the statutory text and legislative history, is that Congress intended to exclude States from exercising authority only over byproduct determined by the NRC to pose "special hazards," H.R. Rep. No. 86-1125, at 10; S. Rep. No. 86-870, at 10—i.e., not the undisputedly nonhazardous wastewater at issue here. At a minimum, Holtec has not shown, as it must, that § 2021(c)(4) "clear[ly] and manifest[ly]," *In re MTBE*, 725 F.3d at 96 (quotation marks omitted), displaces the state law as applied here.

### C. Even State Regulations of Core Activities Are Not Preempted If Enacted for Nonsafety Purposes.

Even if the district court properly identified a core activity affected by the New York statute (and it did not), the district court correctly recognized (S.A. 18-25) that a law that touches upon a core activity generally survives preemption so long as it is enacted for a purpose other than regulating nuclear safety. For example, the Supreme Court has upheld against a field preemption challenge a California law prohibiting construction of new nuclear power plants, because the law was enacted

out of concern for economic development, not nuclear safety. *See Pacific Gas*, 461 U.S. at 216. And the Supreme Court refused to find field preemption even when the challenged state law "addressed construction of a nuclear powerplant, an activity closely regulated by the Federal Government for nuclear safety purposes." *Virginia Uranium*, 587 U.S. at 788-89 (Ginsburg, J., concurring).

Here too, the state law at issue was enacted as an economic—not a nuclear safety—regulation. The sole stated purpose of the law is to address economic concerns with wastewater discharges in the Hudson River that could harm real estate values and economic development, *see* E.C.L. § 30-101—not to address nuclear safety of wastewater discharges that are undisputedly safe, with radiation levels a thousand times below the safe limit (see *supra* at 6-7). The Senate and Assembly memoranda in support of the law likewise make clear that the law's purpose is exclusively economic. (*See* J.A. 1925, 1928.) Such economic regulation does not fall within the preempted field of nuclear safety regulation, much less clearly and manifestly.

Thus, because Holtec has not shown that the state law impermissibly regulates a core activity that Congress clearly reserved exclusively to the federal government, Holtec's field preemption claim must fail.

## POINT II

### NEW YORK'S STATUTE SURVIVES PREEMPTION HERE EVEN UNDER THE DISTRICT COURT'S STANDARD BECAUSE IT HAS NO DIRECT AND SUBSTANTIAL EFFECT ON DECISIONS CONCERNING NUCLEAR SAFETY

The district court's reliance on an incorrect standard for field preemption constitutes reversible error. In any event, even under the district court's invented "two-part" standard, the district court independently erred in finding field preemption. (*See* S.A. 25-26.) That is so because Holtec did not meet its burden to show that the challenged state law at issue here—which the district court rightly recognized is an economic regulation to protect local real estate values and economic development (S.A. 18-25)—has a "direct and substantial effect" on decisions concerning nuclear safety.

As the Supreme Court emphasized in *English*, "not every state law that in some remote way may affect the nuclear safety decisions made by those who build and run nuclear facilities can be said to fall within the

pre-empted field." 496 U.S. at 85. "[F]or a state law to fall within the pre-empted zone, it must have some direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels." *Id.* The state economic regulation at issue here does not.

Specifically, the state law's prohibition on discharge of undisputedly safe wastewater in a particular location (i.e., the Hudson River) does not have the requisite "direct and substantial effect" on decisions concerning "radiological safety levels" to support field preemption. *See id.* The law affects decisions about where to dispose of the wastewater, but such decisions do not concern "radiological safety levels," *id.*, or any of the sorts of "safety and 'nuclear' aspects of energy generation" that Congress intended to reserve to the federal government, *Pacific Gas*, 461 U.S. at 211-12. Rather, the affected decisions concern States' "traditional authority" over economic and land-use matters to protect property values and economic development—i.e., precisely the matters the AEA reserved to the States, *see id.*

The district court erroneously concluded that the state law at issue here directly and substantially affects decisions concerning nuclear

safety merely because the law "requir[es] Holtec to change the method by which it disposes" of the wastewater at issue. (*See* S.A. 29; *see also* S.A. 31.) Holtec has not shown that changing the method by which it disposes of *undisputedly safe* (see *supra* at 6-7) wastewater directly and substantially affects nuclear safety. Holtec asserts only that an alternative to disposal in the Hudson River could have "differing radiological impacts." (*See* J.A. 1556, 1918.) But Holtec has not explained what such "differing radiological impacts" might be. And Holtec expressly agreed that it "has not alleged or shown that any option for disposing of Indian Point's effluent would exceed the 25 millirem safety limit or is otherwise unsafe." (J.A. 2173.)

The district court erred in faulting the State for purportedly failing to "establish" that all the alternatives to disposal of the wastewater in the Hudson River are safe. (*See* S.A. 29.) It is *Holtec*'s burden, both as the party claiming preemption, *see, e.g.*, *In re MTBE*, 725 F.3d at 96, and as the summary judgment movant, *see, e.g.*, *Vermont Teddy*, 373 F.3d at 244, to establish that a state law prohibiting one location for wastewater disposal directly and substantially affects decisions concerning nuclear safety. And, for the reasons just explained, Holtec has not satisfied its

burden. On the contrary, Holtec's admission that no alternative disposal method "would exceed the 25 millirem safety limit or is otherwise unsafe" (J.A. 2173) necessarily confirms that the state law would not actually affect nuclear safety, much less directly and substantially.

The few out-of-circuit cases on which the district court relied (S.A. 26-28) are inapposite. Those cases found field preemption only from state laws or claims that, unlike the state law at issue here, directly and substantially affected nuclear safety decisions in active nuclear facilities. For instance, in *United States v. Manning*, the challenged state law required cleanup of existing nuclear contamination, posing undisputed safety hazards, before new nuclear waste disposal, similarly posing undisputed safety hazards, would be permitted in a particular nuclear facility. *See* 527 F.3d 828, 839-40 (9th Cir. 2008).[7] The challenged law in

---

[7] *See also Cox v. Duke Energy Inc.*, 876 F.3d 625, 637 (4th Cir. 2017) (state law claim seeking to regulate reporting of safety threats at nuclear facility directly and substantially affected nuclear safety decisions); *Vermont Yankee Nuclear Power Corp. v. Entergy Nuclear Vt. Yankee, LLC*, 683 F.3d 1330, 1347-48 (Fed. Cir. 2012) (state law that could deter construction of storage facility for high-level nuclear waste likely directly and substantially affected nuclear safety decisions); *but see id.* at 1353-55 (Dyk, J.) (dissenting in relevant part because state law could fall within state power over "non-safety issues, such as economic or other

(*continued on the next page*)

*Manning* also had the express purpose of regulating nuclear safety, *see id*. at 836-39, again, unlike the state law at issue here (see *supra* at 7-8).

concerns"); *Boldt v. Northern States Power Co.*, 195 F. Supp. 3d 1057, 1063-64 (D. Minn. 2016) (state law claim challenging alcohol-related employee requirements at nuclear facility directly and substantially affected nuclear safety decisions), *aff'd*, 904 F.3d 586 (8th Cir. 2018).

## CONCLUSION

For all these reasons, this Court should reverse the district court's grant of summary judgment to Holtec and denial of summary judgment to the State on Holtec's claim, and remand for further proceedings.[8]

Dated: New York, New York
January 26, 2026

Respectfully submitted,

LETITIA JAMES
*Attorney General*
*State of New York*
Attorney for Appellant

By: */s/ Philip J. Levitz*
PHILIP J. LEVITZ
Senior Assistant Solicitor General

BARBARA D. UNDERWOOD
*Solicitor General*
ESTER MURDUKHAYEVA
*Deputy Solicitor General*
PHILIP J. LEVITZ
*Senior Assistant Solicitor General*
*of Counsel*

28 Liberty Street
New York, NY 10005
(212) 416-6325

[8] These further proceedings should include a determination of whether the State is entitled to summary judgment on its counterclaim that Holtec is violating the state law, an issue the district court did not previously reach, after finding the state law preempted.

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Ava Mortier, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 5,732 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

*/s/ Ava Mortier*

# SPECIAL APPENDIX

## TABLE OF CONTENTS

**Page**

Order & Opinion, dated September 24, 2025 ........ SA1

Final Judgment, dated October 17, 2025 ........ SA33

Environmental Conservation Law § 30-101 ........ SA38

Environmental Conservation Law § 30-103 ........ SA39

42 U.S.C. § 2021 ........ SA40

U.S. Const. art. VI, cl. 2 ........ SA47

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HOLTEC INTERNATIONAL,
HOLTEC INDIAN POINT 2, LLC,
HOLTEC INDIAN POINT 3, LLC, *and*
HOLTEC DECOMMISSIONING
INTERNATIONAL, LLC,

*Plaintiffs*,

v.

THE STATE OF NEW YORK,

*Defendant*.

No. 24-CV-2929 (KMK)

ORDER & OPINION

Appearances:

James M. Catterson, Esq.
Pillsbury Winthrop Shaw Pittman LLP
New York, NY
*Counsel for Plaintiffs*

Jay Eliot Silberg, Esq.
Anne Renee Leidich, Esq.
Pillsbury Winthrop Shaw Pittman LLP
Washington, DC
*Counsel for Plaintiffs*

Channing R. Wistar-Jones, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

Holtec International, Holtec Indian Point 2, LLC ("HIP 2"), Holtec Indian Point 3, LLC ("HIP 3"), and Holtec Decommissioning International, LLC ("HDI"), (collectively, "Holtec" or "Plaintiff") bring this Action against the State of New York ("New York" or "Defendant"), alleging that New York Environmental Conservation Law ("ECL") § 30-0103 (the "Discharge

Statute" or "Statute") is federally preempted and seeking a declaratory judgment to that effect. (*See generally* Compl. (Dkt. No. 1).) Before the Court is Holtec's Motion and New York's Cross-Motion, both for summary judgment. For the reasons discussed below, Holtec's Motion is granted and New York's Cross-Motion is denied.

## I. Background

### A. Factual Background

The following facts are taken from the Parties' statements pursuant to Local Civil Rule 56.1, (*see* Holtec's 56.1 Statement ("Pl's 56.1") (Dkt. No. 32); New York's 56.1 Statement ("Def's 56.1") (Dkt. No. 36); Holtec's 56.1 Response Statement ("Pl's 56.1 Resp.") (Dkt. No. 39); New York's 56.1 Response Statement ("Def's 56.1 Resp.") (Dkt. No. 36); Holtec's 56.1 Statement of Additional Material Facts (Dkt. No. 39); New York's Response to Holtec's Statement of Additional Materials Facts (Dkt. No. 42), as well as admissible record evidence. The facts as described below are undisputed unless otherwise noted.

#### 1. Indian Point

Indian Point Energy Center ("Indian Point") is a power plant consisting of three nuclear reactor units, Indian Point 1, Indian Point 2, and Indian Point 3, located in Buchanan, New York. (Pl's 56.1 ¶ 1.) Indian Point was constructed and initially operated by Consolidated Edison Co. of New York, Inc. ("ConEd"). (*Id.* ¶ 4.) ConEd received operating licenses for Indian Point 1 in 1962, for Indian Point 2 in 1973, and for Indian Point 3 in 1975. (*Id.*) The three reactors were permanently shut down in 1974, 2020, and 2021, respectively. (*Id.* ¶ 5.) On November 23, 2020, Holtec received approval from the U.S. Nuclear Regulatory Commission ("NRC") to assume ownership and operation of Indian Point, including responsibility for decommissioning. (*Id.* ¶ 7.) Holtec is currently in the process of decommissioning Indian Point, which involves

disposing of structures and water, which contains radioactive materials left over from power plant operations and the storage of spent nuclear fuel. (*Id.* ¶¶ 23–24.) Even after treatment to remove radioactive materials, the water still contains tritium, a radioactive isotope of hydrogen that cannot be removed practically. (*Id.* ¶ 25.) Indian Point has been designed to release radioactive liquids into the Hudson River, a process that is in compliance with its NRC licenses. (*Id.* ¶ 26.)[1] Throughout the operation of Indian Point, millions of gallons of water containing tritium have been discharged into the Hudson River. (*Id.* ¶ 28.) In the course of decommissioning Indian Point, Holtec plans to treat and dispose of tritiated water in compliance with applicable NRC licenses and regulations. (*Id.* ¶ 29.) The radiation exposure from the discharge of liquid effluents from Indian Point is estimated at approximately one-thousandth of the twenty-five millirem safety limit. (Def's 56.1 ¶ 8.)

2. New York State Legislation

On February 24, 2023, New York State Senator Peter Harckham introduced a bill, S5181, to amend the ECL. (Pl's 56.1 ¶ 30; Decl. of James M. Catterson ("Catterson Decl."), Ex. A ("S5181") (Dkt No. 30-1).) The Parties dispute whether S5181 "ultimately became" the

---

[1] New York disputes this fact, asserting that: "While NRC may have approved [Indian Point's] design, there is no claim by Holtec or evidence that NRC has approved Holtec's discharges to the Hudson River. Complaint." (Def's 56.1 Resp. ¶ 26.) Local Civil Rule 56.1(d) requires that "[e]ach statement by the movant or opponent [to a motion for summary judgment] . . . must be followed by citation to evidence that would be admissible." New York's citation to the Complaint is "not to admissible evidence and [is] thus improper." *Cotnoir-Debenedetto v. Uniondale Union Free Sch. Dist.*, No. 20-CV-5096, 2023 WL 4274701, at *4–5 (E.D.N.Y. June 29, 2023) (citation omitted); *see also LaFlam v. Am. Sugar Ref., Inc.*, No. 21-CV-6710, 2024 WL 149766, at *1 n.3 (S.D.N.Y. Jan. 12, 2024) ("It is blackletter law that an unverified complaint is not evidence that can be relied upon at summary judgment." (quoting *Caro Cap. LLC v. Koch*, 653 F. Supp. 3d 108, 132 (S.D.N.Y. 2023))). Accordingly, this statement, along with paragraph 27, will be deemed admitted to the extent supported by the record. *See Cotnoir-Debenedetto*, 2023 WL 4274701, at *5 (deeming statements disputed by a non-movant admitted where the non-movant cited to the complaint).

Discharge Statute. (*See* Def's 56.1 Resp. ¶ 30.) S5181 proposed the creation of a new ECL section titled "Prohibition against radiological pollution," providing that "[i]t shall be unlawful for any person or entity, directly or indirectly, to throw, drain, run or otherwise discharge any radiological agent into the waters of the state," and set out fines for violations of the statute. (S5181 at 4–10.) In a memorandum in support of S5181, Senator Harckham provided the following justification for the bill:

> The Hudson [R]iver serves as a drinking water source for over 100,000 New Yorkers. The potential release of radioactive contaminants to our state's most influential river is an urgent matter to the residents of Peekskill and all other communities along the tidal estuary. Exposure to toxic substances and radioactive material poses not only a possible health risk, but also a serious economic risk to our communities with potential negative impacts on real estate values.
> To protect the health and economic well[-]being of its residents, New York must take a strong stance against radiological dumping into state waters. Existing regulations represent the minimum protections the state is required to provide and must evolve over time to be more protective. As climate change continues to threaten us, our water sources will serve as a competitive edge to resiliency. We must ensure they are protected and preserved.

(Pl's 56.1 ¶ 33; Catterson Decl., Ex. B (Dkt. No. 30-2).) On March 1, 2023, Senator Harckham issued a press release noting that the introduction of S5181 "was galvanized when plans were announced by Holtec to release radioactive waste water from the decommissioned Indian Point nuclear power plant into the Hudson River." (Catterson Decl., Ex. C (Dkt. No. 30-3) at ECF 2.)

On April 25 and 27, 2023, the Indian Point Decommissioning Oversight Board held hearings on "controlled radiological effluent discharges from Indian Point." (Catterson Decl., Ex. D ("DOB Hearings Tr.") (Dkt. No. 30-4) at ECF 2.) The Board "provides a venue for information exchange, oversight coordination, and public engagement on all matters pertaining to the [d]ecommissioning of Indian Point." (*Id.* at ECF 4:18–21.)

In May 2023, Senator Harckham and New York Assembly Member Dana Levenberg introduced S6893 and A7208, respectively. (*See* Catterson Decl., Ex. E ("A7208") (Dkt. No. 30-

5); Catterson Decl. Ex. F ("S6893) (Dkt. No. 30-6).) The bills are identical. (*Compare* A7208 *with* S6893). Senator Harckham submitted a memorandum in support of S6893 providing the following justification for the bill:

> The Hudson Rivers is a monumental piece of New York's history, character, and economic success. In 2023, private sector jobs alone in the Hudson Valley increased by 10,500[,] or 1.4 percent, to 787,000. Discharging radiological chemicals from nuclear power plants into our most influential water source has a multitude of adverse and substantial economic impacts on the state and its residents. Our communities along the Hudson River are concerned with the economic impacts on local real estate values and development that could arise as a result of discharging nuclear waste into the waters of the state during the decommissioning process, which is no longer balanced by any economic benefits to those communities provided during operation.

(Decl. of Philip Bein ("Bein Decl."), Ex. 1 (Dkt. No. 34-1) at ECF 2.) Assembly Member Levenberg submitted a memorandum in support of A7208 stating that "[t]he purpose of the bill is to protect communities along the Hudson River from the adverse economic impacts resulting from the discharge of nuclear waste in to the River by decommissioning nuclear power plants" and that "[t]he discharge of nuclear waste into the Hudson River poses a substantial risk to real estate values and the economic development of those communities along the river." (Bein Decl., Ex. 2 (Dkt. No. 34-2) at ECF 2.) Both memoranda characterize their bills as "new" under the section titled "Prior Legislative History." (Bein Decl., Ex. 1 at ECF 2; Bein Decl., Ex. 2 at ECF 2.) After Senate debate on June 9, 2023, (*see* Catterson Decl., Ex. G ("Senate Debate Tr.") (Dkt. No. 30-7)), and Assembly debate on June 20, 2023, (*see* Catterson Decl., Ex. H ("Assemb. Debate Tr.") (Dkt. No. 30-8)), Governor Kathy Hochul signed the Discharge Statute into law on August 18, 2023, (Pl's 56.1 ¶ 53).

The Discharge Statute is codified at ECL Article 30 and is titled "Decommissioning Nuclear Power Plant Discharges into the Hudson River." *See* N.Y. Env. Conserv. L. Art. 30. Section 30-0101 provides legislative findings:

> 1. The legislature finds that while the energy and economic output generated by nuclear power plants are beneficial to the state and its residents, discharges into waters of the state of radiological agents from nuclear power plants have various adverse and substantial economic impacts on the state and its residents.
> 2. The legislature further finds that communities with interests in the Hudson River are concerned with the economic impacts on local real estate values and economic development with respect to the discharge of waste from nuclear power plants into waters of the state during plant decommissioning, which effect is no longer balanced by countervailing economic benefits of the plant to those communities that the plant provided during operation.
> 3. The legislature further finds that other methods of managing waste from decommissioning nuclear power plants are available and would not result in the same economic impacts.
> 4. The legislature therefore finds and declares that it is the duty of the state to act to preserve the economic vitality of affected communities

(*Id.* § 30-0101.) Section 30-0103 provides, in full: "To the extent not subject to preemption by federal law, and notwithstanding any other state or local law, rule, or regulation to the contrary, it shall be unlawful to discharge any radiological substance into the Hudson River in connection with the decommissioning of a nuclear power plant." (*Id.* § 30-0103.)

B. Procedural Background

On April 18, 2024, Holtec initiated this Action. (*See* Compl.) On August 8, 2024, the Court set a briefing schedule related to the instant Motions. (*See* Dkt. No. 27.) On October 7, 2024, Holtec filed its Motion. (*See* Not. of Mot. (Dkt. No. 28); Holtec's Mem. in Supp. ("Pl's Mem.") (Dkt. No. 29); Pl's 56.1.) On November 8, 2024, New York simultaneously responded and filed its Cross-Motion. (*See* Cross Not. of Mot. (Dkt. No. 33); New York's Mem. in Opp. ("Def's Opp.") (Dkt. No. 35); Def's 56.1 Resp.) On November 22, 2024, Holtec filed its Reply. (Holtec's Reply Mem. in Supp. ("Pl's Reply") (Dkt. No. 37); Pl's 56.1 Resp.) On December 6, 2024, New York filed its Reply. (New York's Reply Mem. in Supp. ("Def's Reply") (Dkt. No. 40).)

II. Discussion

A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (same); *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In deciding whether to award summary judgment, the court must construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Torcivia v. Suffolk County*, 17 F.4th 342, 354 (2d Cir. 2021); *see also Horror Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021) (same). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the non[-]moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration, citation, and quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva*

*Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex*, 477 U.S. at 323–24).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (citation omitted)).

B. Analysis[2]

Holtec argues that the Discharge Statute is preempted under field and conflict preemption and because it has a "direct and substantial effect" on a radiological safety decision. (*See* Pl's Mem. 10–20.) New York disagrees and argues that it is entitled to summary judgment because

---

[2] New York initially argued that Holtec lacks standing, (*see* Def's Opp. 6–7), but later withdrew this argument, (*see* Def's Reply 1 n.1). Because the argument is withdrawn, the Court need not address it. *See Venetsky v. United States*, No. 16-CV-8464, 2019 WL 1768967, at *9 n.15 (S.D.N.Y. Mar. 31, 2019) (finding at summary judgment that the court need not address arguments that a party withdrew in its opposition brief).

Holtec has violated the Discharge Statute by discharging radiological substances into the Hudson River. (*See* Def's Opp. 19–20.) The Court addresses these arguments in turn.[3]

The Supremacy Clause provides that the "Constitution, and the Laws of the United States which shall be made in pursuance thereof," are "the supreme law of the land . . ., anything in the Constitution or laws of any state to the contrary notwithstanding." Art. VI, cl. 2. "A corollary of the Supremacy Clause is the doctrine of preemption, under which Congress may 'exercise its constitutionally delegated authority to set aside the laws of a State.'" *Buono v. Tyco Fire Prods., LP*, 78 F.4th 490, 495 (2d Cir. 2023) (quoting *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 30 (1996)). "Preemption is 'a matter of statutory interpretation,' and [the Court] must 'ascertain the intent of Congress.'" *Id.* (quoting first *Cantero v. Bank of Am. N.A.*, 49 F.4th 121, 130 (2d Cir. 2022), then *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280 (1987)). "Accordingly, '[a]s with any question of statutory interpretation,' the Court must 'begin with the text of the statute[.]'" *Ass'n of Contracting Plumbers of City of N.Y., Inc. v. City of New York*, No. 23-CV-11292, 2025 WL 843619, at *2 (S.D.N.Y. Mar. 18, 2025) (quoting *Catskill*

---

[3] The Court notes that neither Party addresses whether this challenge is facial or as-applied. While the caselaw is not entirely clear on this point, the Second Circuit has indicated that a party can bring a "facial preemption challenge to state law," under which that party "must demonstrate that there is no possible set of conditions under which the challenged state [regime] could be constitutional." *Rest. L. Ctr. v. City of New York*, 90 F.4th 101, 117 (2d Cir. 2024) (quoting *Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 634 F.3d 206, 210 (2d Cir. 2011)); *see also Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 644 (2d Cir. 2005) ("'The facial/as-applied distinction would be relevant only if we might find some applications of the statute preempted and others not. . . . [W]here a state statute is in direct conflict' with a federal statute 'or one of its processes,' the 'focus is the act of regulation itself, not the effect of the state regulation in a specific factual situation.'" (quoting *Chamber of Com. v. Lockyer*, 364 F.3d 1154, 1169 (9th Cir. 2004))). Despite Holtec's request that the Court declare that the Discharge Statute is unconstitutional "as applied to Holtec," (Pl's Mem. 2), the Court finds that the challenge is facial.

*Mountains Chapter of Trout Unlimited, Inc. v. Env't Prot. Agency*, 846 F.3d 492, 512 (2d Cir. 2017)). There are three types of preemption:

> (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives. The latter two are forms of implied preemption.

*In re Unite Here Data Sec. Incident Litig.*, 740 F. Supp. 3d 364, 377 (S.D.N.Y. 2024) (quoting *Figeuroa v. Foster*, 864 F.3d 222, 227–28 (2d Cir. 2017)), *motion to certify appeal denied*, No. 24-CV-1565, 2024 WL 4307975 (S.D.N.Y. Sept. 26, 2024). All three types of preemption "work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018).

1. Field Preemption

The first step in "determin[ing] whether Congress has implicitly ousted the States from regulating in a particular field . . . [is] identify[ing] the field in which this is said to have occurred." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020). The Court "does not write on a blank slate in defining the field at issue for preemption under the [AEA] because the Supreme Court has already brought its contours into focus," although "the Supreme Court's view of field preemption with respect to the nuclear industry has shifted over time." *Williams v. BHI Energy I Power Servs., LLC*, No. 21-CV-1186, 2023 WL 5403796, at *5 (D. Minn. Aug. 24, 2023), *motion to certify appeal denied*, No. 21-CV-1186, 2024 WL 986678 (D. Minn. Mar. 7, 2024).

There are four Supreme Court decisions that are relevant here. The Supreme Court first encountered the question of field preemption as it relates to the nuclear industry in *Pacific Gas &*

*Energy Company v. State Energy Resources Conservation & Development Commission*, 461 U.S. 190 (1983). The case concerned a California law that "impose[d] a moratorium on the certification of new nuclear plants" that was contingent upon a state agency's approval of nuclear waste storage plans. *Id.* at 198. The Supreme Court stated that "the federal government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the states," *id.* at 212, and upheld the statute because the rationale for enacting the California law was an "economic purpose," placing it "outside the occupied field of nuclear safety regulation," *id.* at 216.

The next year the Supreme Court heard *Silkwood v. Kerr-McGee Corporation*, 464 U.S. 238 (1984), which addressed whether a state-law award of punitive damages against the operator of a nuclear facility was preempted, *id.* at 244–46. The defendant-appellee argued that *Pacific Gas* was dispositive of the case and that "because the state-authorized award of punitive damages in this case punishes and deters conduct related to radiation hazard, it falls within the prohibited field." *Id.* at 249. The Supreme Court rejected that argument, noting "that the preempted field does not extend [that] far," *id.*, and held that the award was not preempted because "Congress assumed that state-law remedies, in whatever form they might take, were available to those injured by nuclear incidents." *Id.* The Supreme Court reached this holding despite the "tension between the conclusion that safety regulation is the exclusive concern of the federal law and the conclusion that a state may nevertheless award damages based on its own law of liability." *Id.* at 256.

Four years later, the Supreme Court again addressed the issue in *English v. General Electric Company*, 496 U.S. 72 (1990), which concerned whether a state-law cause of action for intentional infliction of emotional distress and retaliation related to an employee's complaints

about nuclear safety were preempted, *id.* at 74–78. The Supreme Court walked back *Pacific Gas* and *Silkwood*'s emphasis on safety motivations and focused instead on whether the claim "is so related to the 'radiological safety aspects involved in the . . . operation of a nuclear [facility] that it falls within the pre-empted field." *Id.* at 85 (citation and quotation marks omitted). The Supreme Court held that "for a state law to fall within the pre-empted zone, it must have some direct and substantial effect on the decisions made by those who build and operate nuclear facilities concerning radiological safety levels." *Id.* The *English* Court clarified that, "even as [*Pacific Gas*] suggested that part of the pre-empted field is defined by reference to the purpose of the state law in question, it made clear that another part of the field is defined by the state law's actual effect on nuclear safety." *Id.* at 84.

In 2019, the Supreme Court revisited nuclear field preemption in *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761 (2019), which addressed whether a Virginia law banning uranium mining was preempted, *id.* at 765. Justice Gorsuch, writing for a plurality in the lead opinion, "tried to modernize and make sense of the Court's precedents in *Pacific Gas*, *Silkwood*, and *English*." *Williams*, 2023 WL 5403796, at *7. The lead opinion and the concurrence, written by Justice Ginsburg, both agreed that the Virginia law was not preempted because it did not encroach on the relevant field, which is defined as the core activities set forth in 42 U.S.C. § 2021(c) ("Section 2021(c)"), excepting regulation of activities "for purposes other than protection against radiation hazards," as provided by 42 U.S.C. § 2021(k) ("Section 2021(k)"). *See Va. Uranium*, 587 U.S. at 771–72 (Gorsuch, J., lead opinion); *id.* at 787–89 (Ginsburg, J., concurring). The core activities as laid out in Section 2021(c) are:

> (1) the construction and operation of any production or utilization facility or any uranium enrichment facility;
> (2) the export from or import into the United States of byproduct, source, or special nuclear material, or of any production or utilization facility;

> (3) the disposal into the ocean or sea of byproduct, source, or special nuclear waste materials as defined in regulations or orders of the [NRC];
> (4) the disposal of such other byproduct, source, or special nuclear material as the [NRC] determines by regulation or order should, because of the hazards or potential hazards thereof, not be so disposed of without a license from the [NRC].

42 U.S.C. § 2021(c). Section 2021(k) states that: "Nothing in this section shall be construed to affect the authority of any State or local agency to regulate activities for purposes other than protection against radiation hazards." *Id.* § 2021(k). In an attempt to synthesize the holding of *Pacific Gas*, both opinions suggested that an inquiry into legislative history to discern the purpose for which a state law was enacted is permissible when the state law intrudes on the federal government's Section 2021(c) core activities. *See Va. Uranium*, 587 U.S. at 772 (Gorsuch, J., lead opinion) (stating that "subsection (k) does not authorize any judicial inquiry into state legislative purpose" where "the activity [the state's] law regulates . . . isn't one the AEA has ever addressed[] and . . . isn't one [Section] 2021 discusses"); *id.* at 789 (Ginsburg, J., concurring) (stating that inquiry into "whether the state law was enacted . . . for purposes other than protection against radiation hazards" is "unsurprising" where the state law "address[es] . . . an activity closely regulated by the Federal Government for nuclear safety purposes" (quotation marks and citation omitted)).

The lead opinion and the concurrence in *Virginia Uranium* did not directly address *English*'s holding that, "for a state law to fall within the pre-empted zone, it must have some direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels." *English*, 496 U.S. at 85. The absence of an express overruling of *English* and the fact that the lead opinion and the concurrence "cited [*English*] with approval" suggest that *English*'s test is not retroactive. *See Williams*, 2023 WL 5403796, at *7 (concluding that the court "is still bound by the test announced in *English*, even if it may fall secondary to the core activities test announced in *Virginia Uranium*"). Accordingly,

the Court agrees with the analysis in *Williams* and adopts its two-part test for preemption of state laws in the nuclear safety field under the AEA:

> First, if a state law regulates a core activity described in 42 U.S.C. § 2021(c), the state law is preempted only if it was enacted for the purpose of addressing nuclear safety. [*Va. Uranium*, 587 U.S. at 769–73 (Gorsuch, J., lead opinion).] If it was enacted "for purposes other than protection against radiation hazards," 42 U.S.C. § 2021(k), it is not preempted. Second, regardless of whether the state law regulates a core activity, it can still be preempted if it has a "direct and substantial effect" on the radiological safety decisions of those who construct or operate nuclear facilities. [*English*, 496 U.S. at 85.]

*Id.* at *8; *see also Vt. Yankee Nuclear Power Corp. v. Entergy Nuclear Vt. Yankee, LLC*, 683 F.3d 1330, 1347 (Fed. Cir. 2012) ("Under the Supreme Court's test, a state law related to nuclear power is preempted if it: (1) is motivated by safety concerns or (2) 'ha[s] some direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels[.]' (citations omitted)); *Pennsylvania v. Lockheed Martin Corp.*, 684 F. Supp. 2d 564, 586 (M.D. Pa. 2010) ("[T]he question in this case is whether the state claims . . . involve nuclear safety concerns, if so they are preempted. If they do not, then the court must determine whether they bear a direct and substantial effect on the decisions made by those who run nuclear facilities and/or whether there are irreconcilable conflicts between them and the AEA.").

a. Core Activity

Holtec argues that the Discharge Statute implicates subsections (1), (3), and (4) of Section 2021(c). (*See* Pl's Mem. 11; Pl's Reply 13.) New York argues that subsection (1) does not apply because construction of Indian Point is complete and the facility is no longer in operation, (Def's Opp. 17), that subsection (3) does not apply because the Hudson River is not an "ocean or sea," (Def's Reply 4), and that subsection (4) does not apply because the discharges at issue here "do not exceed regulatory limits for radiological exposure" as laid out in NRC

regulations, and therefore are not "hazards or potential hazards," (*id.*). Neither Party addresses subsection (2).

Subsection (1) provides that "the construction and operation of any production or utilization facility or any uranium enrichment facility" is a core activity. 42 U.S.C. § 2021(c)(1). Holtec does not respond to New York's argument that subsection (1) does not apply because decommissioning is not a component of "construction and operation." (*See generally* Pl's Mem.; Pl's Reply.) Accordingly, the Court considers the argument abandoned. *See Seward v. Antonini*, No. 20-CV-9251, 2023 WL 6387180, at *14 (S.D.N.Y. Sept. 29, 2023) ("A party abandons a claim in the context of a summary judgment motion when she does not respond to arguments concerning that claim." (quoting *Bryant v. Steele*, 462 F. Supp. 3d 249, 270 (E.D.N.Y. 2020))).[4]

As for subsection (3), it provides that "the disposal into the ocean or sea of byproduct, source, or special nuclear waste materials as defined in regulations or orders of the [NRC]" is a core activity. 42 U.S.C. § 2021(c)(3). Subsection (3) clearly does not apply to the Discharge Statute. The term "ocean" generally refers to "five oceans: Atlantic, Pacific, Indian, Arctic, and

---

[4] The Court notes that New York fails to cite any law in support of the contention that the AEA and NRC regulations do not apply to Holtec because they apply only to operating facilities. (*See* Def's Opp. 17 n.1.) The Court has not found any support for New York's assertion. On the contrary, "it [is] inconsequential to the pre-emption analysis whether the nuclear facility is operational or decommissioned. The presence of radiation hazards is sufficient to give rise to the NRC's exclusive jurisdiction." *Missouri v. Westinghouse Elec., LLC*, 487 F. Supp. 2d 1076, 1087 (E.D. Mo. 2007). This is unsurprising given that the management of radioactive waste outlives the operation of a nuclear energy facility. *See Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 692 (2025) (Gorsuch, J., dissenting) ("Spent nuclear fuel is radioactive, explosive, and highly volatile, and it can remain so for thousands of years." (citation and quotation marks omitted)); *What's the Lifespan for a Nuclear Reactor? Much Longer Than You Might Think*, U.S. DEP'T OF ENERGY (Apr. 16, 2020), https://www.energy.gov/ne/articles/whats-lifespan-nuclear-reactor-much-longer-you-might-think [https://perma.cc/CW2U-AZH7] (indicating that approximately 20% of the nation's nuclear energy facilities "plan[] or intend[] to operate up to 80 years.").

Antarctic." *Ocean*, BLACK'S LAW DICTIONARY (12th ed. 2024). As for "sea," the term can be used interchangeably with "ocean" and can also refer to "[a] large landlocked part of the ocean" or "a large body of salt water smaller than a regular ocean." *Sea*, BLACK'S LAW DICTIONARY (12th ed. 2024). In contrast, the Hudson River "is a tidal estuary with a 'salt front' of water moving upstream and down." *Hudson River Fishermen's Ass'n v. City of New York*, 751 F. Supp. 1088, 1094 (S.D.N.Y. 1990), *aff'd,* 940 F.2d 649 (2d Cir. 1991). A resident of the Southern District of New York need look southeast, not west to the Hudson, to catch a glimpse of a body of water that could be called an ocean or sea.[5]

Subsection (4) provides that "the disposal of such other byproduct, source, or special nuclear material as the [NRC] determines by regulation or order should, because of the hazards or potential hazards thereof, not be so disposed of without a license from the [NRC]" is a core activity of the NRC. 42 U.S.C. § 2021(c)(4). New York argues that, because the tritiated water contains one-thousandth the regulatory limit as set by the NRC, it is not a "hazard[] or potential hazard[]" under this subsection. (Def's Reply 4.) This argument fails to hold water as it is contrary to the plain meaning of the statute. Section 2021(c)(4) is not limited, as New York suggests, only to "disposals that would exceed NRC regulatory limits." (*Id.* (emphasis omitted).) Rather, the clause "because of the hazards or potential hazards thereof" merely clarifies that the provision applies to "byproduct, source, or special nuclear material," the disposal of which requires an NRC license. Federal regulations promulgated pursuant to the AEA "establish standards for protection against ionizing radiation resulting from activities conducted under

---

[5] Neither Party discusses whether disposal of byproduct into a river that empties into an ocean or sea comes within the ambit of subsection (3). Because the Parties are silent on the matter and because the plain language of subsection (3) does not contemplate bodies of water other than oceans and seas, the Court does not investigate further.

Case: 25-2657, 01/26/2026, DktEntry: 30.1, Page 58 of 87

licenses issued by the [NRC]" and "control the . . . disposal of licensed materials by any licensee . . . ." 10 C.F.R. § 20.1001. The Parties do not dispute that Indian Point and Holtec are subject to these regulations. (*See* Pl's 56.1 ¶ 15; *see also* Decl. of Frank Spagnuolo ("Spagnuolo Decl."), Ex. B (Dkt. No. 31-2) at ECF 12 (indicating the license for Indian Point 1 is subject to 10 C.F.R. Part 20); Spagnuolo Decl., Ex. C (Dkt. No. 31-3) at ECF 8 (same for Indian Point 2); Spagnuolo Decl., Ex. D (Dkt. No. 31-4) at ECF 7 (same for Indian Point 3).)[6] The Discharge Statute prohibits the discharge of "any radiological substance into the Hudson River . . . ." ECL § 30-0103. The Court finds that the Discharge Statute and Section 2021(c)(4) overlap such that the state law treads on a core activity described in 42 U.S.C. § 2021(c). Accordingly, the Court turns to an inquiry into the state's purpose in enacting the Discharge Statute. *Cf. Va. Uranium*, 587 U.S. at 772 (Gorsuch, J., lead opinion) (holding that "subsection (k) does not authorize any judicial inquiry into legislative purpose" where "the activity [the state's] law regulates . . . isn't one the AEA has ever addressed[] and it isn't one [Section] 2021 discusses"); *see id.* at 788–89 (Ginsburg. J., concurring) (noting that "it may sometimes be appropriate to inquire into the

---

[6] New York attempts to dispute this fact, saying simply: "Disputed. Plaintiffs and IPEC are also subject to the provisions of [the Discharge Statute]." (Def's 56.1 Resp. ¶ 15.) New York's response fails to actually dispute the proffered fact, which is that Holtec and Indian Point are subject to regulations provided in 10 C.F.R. Part 20. (*See* Pl's 56.1 ¶ 15.) Asserting that Holtec is "also subject" to the Statute comes nowhere close to disputing that 10 C.F.R. Part 20 applies to Holtec. Because New York fails to specifically controvert this fact, the Court will deem it admitted because it is supported by record evidence. *See Santander Consumer USA, Inc. v. City of Yonkers*, No. 22-CV-8870, 2024 WL 4817649, at *1 (S.D.N.Y. Nov. 18, 2024) (deeming admitted facts that a non-movant failed to specifically controvert); *cf. Mae v. Quickway Estates LLC*, No. 22-CV-3048, 2023 WL 6162927, at *1 n.2 (S.D.N.Y. Sept. 21, 2023) (deeming facts to which defendant asserted general denials admitted once the Court "scrutinize[d] [p]laintiff's submitted evidence to determine whether the evidence supports [p]laintiff's statements.").

purpose for which a state law was enacted" where the state law addresses "an activity closely regulated by the Federal Government for nuclear safety purposes.").

New York argues that the Discharge Statute was enacted "out of economic concerns" and highlights that the law includes "no findings about the radiological safety of the prohibited discharges." (Def's Opp. 9.) It is true that the Discharge Statute's legislative findings reference economic motivations and do not mention safety concerns. *See* N.Y. Env. Conserv. L. § 30-0101. That, however, is not the end of the matter, because the Second Circuit has noted that

> [courts] do not blindly accept the articulated purpose of [a state statute] for preemption purposes. If that were the rule, legislatures could "nullify nearly all unwanted federal legislation by simply publishing a legislative committee report articulating some state interest or policy—other than frustration of the federal objective—that would be tangentially furthered by the proposed state law."

*Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393, 416 (2d Cir. 2013) (quoting *Greater N.Y. Metro. Food Council, Inc. v. Giuliani*, 195 F.3d 100, 108 (2d Cir. 1999), *abrogated on other grounds by Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525 (2001)). Indeed, Holtec draws upon the Discharge Statute's alleged legislative history to argue that New York's *actual* purpose is concern about nuclear safety and that the economic justification is mere pretext. (Pl's Mem. 17–20.) New York responds that the Statute's stated purpose is the only purpose the Court can and should consider and that "the Supreme Court has twice expressed disapproval of inquiring too deeply into legislative motives." (Def's Opp. 11–14.) The Court recognizes that it should not "too hastily accept[] [Holtec's] invitation to become embroiled in attempting to ascertain state legislative motives[.]" *Va. Uranium*, 587 U.S. at 777 (citation and quotation marks omitted) (alterations adopted). However, such an inquiry is warranted here because the Discharge Statute on its face "trench[es] on core federal powers reserved to the federal government by the AEA." *Id.* at 773.

"The hierarchy of legislative history values committee reports over floor statements, and floor statements by key legislative drafters and sponsors over floor statements of other members of [the legislature]." *Saunders v. City of New York*, 594 F. Supp. 2d 346, 354 (S.D.N.Y. 2008) (citing *Garcia v. United States*, 469 U.S. 70, 76 (1984), and *United States v. Indelicato*, 865 F.2d 1370, 1382 (2d Cir. 1989)); *Shapiro v. Peacock TV*, No. 23-CV-6345, 2025 WL 968519, at *9 n.6 (S.D.N.Y. Mar. 31, 2025) ("The most enlightening source of legislative history is generally a committee report . . . ." (quoting *Chai v. Comm'r of Internal Revenue*, 851 F.3d 190, 219 (2d Cir. 2017))). "[E]xcerpts from committee hearings and scattered floor statements by individual lawmakers" are "among the least illuminating forms of legislative history." *Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 481 (2017) (citation and quotation marks omitted).

Here, there is no committee report. The legislative history comprises floor statements by Senator Harckham and Assembly Member Levenberg and debate in the Senate and Assembly. Holtec starts with S5181, a bill introduced by Senator Harckham that it argues "ultimately became" the Discharge Statute—a fact that New York disputes. (*See* Pl's Mem. 6; Def's 56.1 Resp. ¶ 30.) S5181 prohibits "any person or entity, directly or indirectly, to throw, drain, run or otherwise discharge any radiological agent into the waters of the state." (S5181.) The Court declines to follow Holtec down the inferential rabbit hole. The Supreme Court has cautioned against reading too deeply into a legislature's consideration and rejection of a provision that resembles a later-enacted law, as "subsequent legislative history is a 'hazardous basis for inferring the intent of an earlier' [legislature]." *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (quoting *United States v. Price*, 361 U.S. 304, 313 (1960)); *see also id.* ("It is a particularly dangerous ground on which to rest an interpretation of a prior statute when it concerns, as it does here, a proposal that does not become law."); *Bostock v. Clayton Cnty.*, 590

U.S. 644, 670 (2020) ("Arguments based on subsequent legislative history . . . should not be taken seriously, not even in a footnote." (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 632 (1990) (Scalia, J., concurring))); *New York v. Dep't of Just.*, 951 F.3d 84, 110 (2d Cir. 2020) (noting that "several equally untenable inferences may be drawn from [legislative] inaction" (quotation marks omitted) (quoting *LTV Corp.*, 496 U.S. at 659)). The analysis in *Pacific Gas* is on point; there, the plaintiff argued that an initiative, from which the law at issue arose, and companion provisions in California's nuclear laws were "more clearly written with safety purposes in mind" and that this "common heritage" should have tainted the law at issue. 461 U.S. at 215. The Supreme Court summarily rejected this argument, noting that "[t]he short answer . . . is that these other state laws are not before the [Supreme] Court[] and . . . [the proposition] was not passed," thereby limiting their impact on the Supreme Court's analysis. *Id.* at 216.

Holtec argues that the legislative history indicates that the Discharge Statute was "grounded in [radiological] safety concerns." (Pl's Mem. 17 (quoting *Entergy Nuclear*, 733 F.3d at 422).)[7] The Court notes that, at first glance, there is some tension in the Second Circuit's 2013

---

[7] Holtec also points to transcripts of meetings held by the Indian Point Decommissioning Oversight Board. (*See* DOB Hearings Tr.) These meetings "garner[ed] input from members of the public on controlled radiological effluent discharges from Indian Point," (*id.* at ECF 2), and included discussion by panelists, including representatives from the NRC, the Environmental Protection Agency, and Holtec, an independent technical expert, Senator Harckham, and Assembly Member Levenberg, (*see generally id.* at ECF 212–411).

The transcripts are of limited persuasiveness when it comes to the Court's legislative history inquiry, as the Supreme Court has warned that such materials are "among the least illuminating forms of legislative history." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 437 (2019) (quoting *Advoc. Health Care Network*, 581 U.S. 468, 481 (2017)). In any case, the Court has reviewed the transcripts and found the comments by the Statute's sponsors, Senator Harckham and Assembly Member Levenberg, to be consistent with their statements during the Senate and Assembly debate, respectively. To that end, the meeting transcripts simply bolster those more reliable materials. *Cf. id.* (noting that the reliability of committee

holding in *Entergy Nuclear* and the Supreme Court's 2019 decision in *Virginia Uranium*. Indeed, *Entergy Nuclear* could be read, as it appears Holtec does, to support the proposition that a court can and should dive into legislative history and scrutinize proffered legislative motivations to see if they, at their very core, rely more on nuclear safety than some other permissible non-safety rationale. But it is worth noting that in *Entergy Nuclear* both the district court and Second Circuit found the legislature had been "remarkabl[y] consisten[t]" in "express[ing] concern about radiological safety and . . . a *desire to evade federal preemption*." *Entergy Nuclear*, 733 F.3d at 420 (emphasis added); *see also id.* ("Okay, let's find another word for safety[.]"); *id.* at 421 ("I understand that only the feds are allowed to think of safety issues, and we carefully don't use that word here."). The Second Circuit noted that these and other comments were "not merely isolated comments by a few legislators, but rather part of a consistent effort by those responsible for drafting and passing [the state law at issue] to obfuscate the record through the use of misleading statements that they thought would pass muster under *Pacific Gas*." *Id.* at 421. Further, while the lead opinion in *Virginia Uranium* lays out the "conceptual and practical" concerns with "potential misadventures into hidden state legislative intentions," *Va. Uranium*, 587 U.S. at 776 (Gorsuch, J., lead opinion), the concurrence specifically disclaims this language, *see id.* at 781 (Ginsburg, J., concurring). As such, the Court takes the narrowest holding it can extract from *Virginia Uranium*—that inquiry into legislative history may be warranted when a state law encroaches on a Section 2021(c) core activity. *See* supra Section II.B.1; *cf. United States v. Mackey*, 652 F. Supp. 3d 309, 342 (E.D.N.Y. 2023)

---

hearing excerpts are particularly suspect when they "do not comport" with more reliable sources of legislative history like "official committee reports that are consistent with the plain and ordinary meaning of the statute's terms.").

("Where . . . 'a fragmented [Supreme] Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the [Supreme] Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" (quoting *Marks v. United States*, 430 U.S. 188, 193 (1977))). That being said, the Court agrees that "piling inference upon inference about hidden legislative wishes . . . risk[s] displacing the legislative compromises actually reflected in the statutory text[.]" *Va. Uranium*, 587 U.S. at 778 (Gorsuch, J., lead opinion).

Holtec argues that Senator Harckham and Assembly Member Levenberg's comments "demonstrate that the true motivations for the law were radiological safety concerns and the potential for speculative downstream economic impacts arising from those concerns." (Pl's Mem. 19.) Holtec relies heavily on *Entergy Nuclear*, in which the Second Circuit affirmed the district court's finding that "legislators' concerns regarding the radiological safety of Vermont Yankee were a primary motivating force for [the statute at issue]." *Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 838 F. Supp. 2d 183, 229 (D. Vt. 2012), *aff'd in part, rev'd in part*, 733 F.3d 393 (2d Cir. 2013). The district court noted "numerous references to safety [that] reflect[ed] legislators' responsible recognition that Vermont is preempted from regulating radiological health and safety and indicate their desire to avoid invalidating their work on that ground." *Id.*

Senator Harckham explicitly acknowledged that, "when it comes to the health impacts, yes, the federal government does have preemption," but stated that the "premise" of the Statute was based on Section 2021(k) and the Supreme Court's decision in *Pacific Gas*. (Senate Debate Tr. at 6792:10–6793:4; *see also* Assemb. Debate Tr. at 169 (in response to a question about federal preemption, Assembly Member Levenberg explained that the Statute "specifically has to

do with the economic impacts of the discharge" and asserted that "the Supreme Court agreed with the [Ninth] Circuit that the State has the ability to regulate if it would have a negative impact on the economy").) Here, the New York legislature was attempting to thread a needle it believed was created by *Pacific Gas*. It was not, like the legislature in *Entergy Nuclear*, masking its true concern in radiological safety with other non-safety reasons, such as the state's need for power and the economic impact of long-term nuclear waste storage. *See Entergy Nuclear*, 838 F. Supp. 2d at 228–29. For this reason, *Entergy Nuclear* does not compel a finding of preemption.

Undaunted, Holtec also argues that the Statute fails because "every reference to economic concerns in the Senate and Assembly debates links those concerns to fears arising from perceived safety risks." (Pl's Mem. 18.) But both sponsors stated multiple times, in different ways, that the Statute was primarily motivated by economic impact. (*See* Senate Debate Tr. at 6785:7–10 (describing the Statute as "not about the health and it's not about the [radiological] levels. It's about the economic impact that the communities fear this will have"); *id.* at 6789:16–21 (noting that members of the public were concerned about "a safe level of tritium exposure" but stating that "[t]hat's not what this bill is about. It's about the economic vitality"); *id.* at 6790:13–17 (stating that the bill is "trying to . . . prevent economic harm to the Lower Hudson Valley"); Assemb. Debate Tr. at 130 ("[T]he purpose of this bill is to help prevent adverse impacts including decreased real property values for the Hudson River communities in relation to the dumping of radioactive waste into the Hudson.").) The sponsors did acknowledge that the economic impact motivation is closely related to concern about nuclear safety. (*See* Senate Debate Tr. at 6786:20–23 ("[A]ll of a sudden the community hears that 1.5 million gallons of tritiated water are going to be released, it causes panic. And that's the fear that folks have."); Assemb. Debate Tr. at 136 (stating that "the psychological impact on the public knowing that

there's been radiological discharge into the Hudson would dampen tourism . . . [and] property values"); *id.* at 154 (noting that "economic impacts to the Hudson River Valley . . . is something that is intrinsically impacted by public perception"); *id.* at 170 ("We're dealing with the economic impact, and that is a combination of public perception and what that has to do with environmental or health impacts. So even though this bill doesn't discuss environmental health impacts, the public perception is tied to what they believe . . . could actually happen to them if they were to swim, boat, paddle or live on and dip their toes into the Hudson River."); *id.* at 182 ("Public perception of a polluted, hazardous river will undermine our local economy in various ways, harming property values, business interests and much more.").) But such acknowledgment does not poison their motivations, and the Court declines to divine the primacy of permissible versus impermissible motivations through an even more searching analysis of the legislative history.

While this is a close call, the Court finds that it cannot conclude on this record that the New York Legislature acted with "an impermissible primary purpose." *Entergy Nuclear*, 733 F.3d at 421. Next, the Court must determine whether the Discharge Statute is preempted under the test set forth in *English*.

b. Direct and Substantial Effect

Holtec argues that the Discharge Statute is preempted because it requires Holtec "find an alternative method by which to dispose of tritiated water," which is "a direct and substantial effect on Holtec's decision on how to safely dispose of radioactive materials." (Pl's Mem. 14–15.)

As mentioned above, "regardless of whether the state law regulates a core activity, it can still be preempted if it has a 'direct and substantial effect' on the radiological safety decisions of

those who construct or operate nuclear facilities." *Williams*, 2023 WL 5403796, at *8 (quoting *English*, 496 U.S. at 85). In the nuclear context, courts have found a range of state laws preempted for having such an effect. For example, *Cox v. Duke Energy Inc.*, 876 F.3d 625 (4th Cir. 2017), concerns a plaintiff who flew a glider close to defendant's nuclear facility, prompting the defendant to contact law enforcement, which resulted in plaintiff's arrest, *id.* at 629. The plaintiff asserted that the defendant's "negligent reporting" about his glider activity "was the but-for cause of his false arrest and imprisonment." *Id.* at 635–36. The district court held and the Fourth Circuit affirmed that "[the defendant's] conduct, even if tortious, was responsive to the safety concerns governed exclusively by federal law and imposing liability based on such claims would have a 'direct and substantial effect' on decisions designed to ensure the facility's safety." *Id.* at 636 (citations omitted). Indeed, "the entire incident implicated the very nuclear safety concerns at the core of the field preempted by federal law." *Id.* *Boldt v. Northern States Power Company*, 195 F. Supp. 3d 1057 (D. Minn. 2016), concerns a plaintiff who sued the defendant nuclear facility operator alleging disability discrimination under the state law based on a perceived disability of alcoholism, *see id.* at 1058. The state law "forb[ade] an employer from discriminating against a person with respect to the conditions or privileges of employment because of a disability except when based on a bona fide occupational qualification." *Id.* at 1063. Under relevant NRC regulations, the defendant had a duty "to provide reasonable assurances that individuals who are granted unescorted access to nuclear power plant protected areas are trustworthy and reliable as demonstrated by the avoidance of substance abuse." *Id.* (alteration adopted) (citation and quotation marks omitted). The court found the state law preempted because it had a direct and substantial effect on decisions made by the defendant in that it forced the defendant to decide between facing liability under the state law or "allowing an

employee who [they] regard[ed] as having a substance abuse problem to continue to have condition-free unescorted access to protected areas of [the] nuclear power plant." *Id.* *United States v. Manning*, 527 F.3d 828 (9th Cir. 2008), concerns the impact of a Washington law that regulated "materials that are variously described as hazardous, dangerous, radioactive, or having some combination of these attributes," on a facility operated by the U.S. Department of Energy ("DOE") that housed radioactive waste. *Id.* at 831, 833 (citation omitted). The district court found that the state law had eight potential direct and substantial effects on DOE. *See United States v. Manning*, 434 F. Supp. 2d 988, 1006 (E.D. Wash. 2006), *aff'd*, 527 F.3d 828 (9th Cir. 2008). The district court also found that "[f]orcing plaintiffs to speculate how the [state law] might be applied by [Washington] . . . [is] enough in [itself] to directly and substantial affect plaintiffs' decisions about AEA materials." *Id.* at 1007. The Ninth Circuit affirmed that the state law was preempted "because it directly and substantially impact[ed] the DOE's decisions on the nationwide management of nuclear waste." *Manning*, 527 F.3d at 839. The Ninth Circuit also noted the direct and substantial effect that "[l]egislation geared to effectively close [the facility at issue] for an extended period of time" had on "the DOE's ability to make decisions regarding if and when it will ship additional waste to [that facility]." *Id.* at 840.

A state law that deters an AEA core activity can also be deemed to have a direct and substantial impact. In *Vermont Yankee Nuclear*, the Federal Circuit reasoned that a state law requiring a nuclear facility operator pay significant monies into a Clean Energy Development Fund "as a condition of constructing a dry storage facility[] could easily deter a utility from constructing such a facility whose construction is encouraged if not mandated by federal law." 683 F.3d at 1347. In other words, the court found that "the requirement to pay money into the

Clean Energy Development Fund could have a 'direct and substantial effect' on decisions concerning radiological safety." *Id.* at 1348.

Holtec asserts that "the Discharge [Statute] prohibits Holtec from discharging any radiological substances connected with decommissioning into the Hudson River." (Pl's 56.1 ¶ 57.) New York disputes this and states: "Disputed. There are other alternatives for disposition of tritiated wastewater from Indian Point which may also comply with federal law." (Def's 56.1 Resp. ¶ 57.) This does not actually controvert Holtec's asserted fact. That there are alternative means of disposal does not address whether the Discharge Statute prohibits Holtec from discharging tritiated water into the Hudson River. Accordingly, this fact is deemed admitted. *See Mae*, 2023 WL 6162927, at *1 n.2. Holtec also asserts that the Statute "will force Holtec to seek an alternative with differing radiological impacts from discharging into the Hudson River." (Pl's 56.1 ¶ 58.) New York disputes this too, stating: "Disputed. All of the alternatives are safe with no substantial safety risk because the concentration of radiological substances in the wastewater is 1000 times lower than the public safety exposure limits of 25 [millirems]." (Def's 56.1 Resp. ¶ 58.) In support, New York cites page 36 of Holtec's 2023 Annual Radioactive Effluent Release Report. (Spagnuolo Decl., Ex. E (Dkt. No. 31-5) at 36.) Page 36 contains a table, reproduced below, that shows the maximum radiation doses that are permitted to an individual's body, thyroid, and organs and Indian Point's 2023 actual dose assessments for routine airborne effluents, routine liquid effluents, and other pathways. (*Id.* 36.)

**Table 6-1 Summation of Dose Assessments**

| Year: 2023 | | Total Body | Thyroid | Max Organ |
|---|---|---|---|---|
| 40 CFR 190 limit ===➔ | IPEC | 25 mrem | 75 mrem | 25 mrem |
| Routine Airborne Effluents[1] | Units 1 and 2 | 1.69E-04 | 1.69E-04 | 1.69E-04 |
| Routine Liquid Effluents | Units 1 and 2 | 2.46E-02 | 8.67E-06 | 4.10E-02 |
| Routine Airborne Effluents[1] | Unit 3 | 1.76E-03 | 1.76E-03 | 1.76E-03 |
| Routine Liquid Effluents | Unit 3 | 0.00E+00 | 0.00E+00 | 0.00E+00 |
| Ground Water & Storm Drain Totals | IPEC[2] | 8.48E-05 | 2.00E-07 | 3.45E-04 |
| Direct Shine from areas such as dry cask storage, radwaste storage, SG Mausoleum, etc. | IPEC[3] | 4.90E-01 | 4.90E-01 | 4.90E-01 |
| Indian Point Energy Center Total Dose, per 40 CFR 190 | IPEC | 5.17E-01 | 4.92E-01 | 5.33E-01 |

This table of assessed doses for Indian Point during 2023 cannot possibly support the assertion that "[a]ll alternatives [to discharge via the Hudson River] are safe with no substantial safety risk." (Def's 56.1 Resp. ¶ 58.) How does a table of assessed doses resulting from effluents establish that other alternatives, including mixing tritiated water with clay and transporting the mixture via truck or train, or storing the water in tanks that must be vented, or allowing the water to evaporate, (*see* Pl's 56.1 ¶¶ 48–50 (providing examples of alternative disposal methods discussed by Senator Harckham that are undisputed)), are safe? The simple answer is it does not. The fact remains that the Discharge Statute "categorically preclude[s] [Holtec] from utilizing a federally accepted method of disposal." (Pl's Reply 10.) By requiring Holtec to change the method by which it disposes of tritiated water, the Statute directly and substantially effects decisions concerning radiological safety levels.[8] At bottom, the Statute has the effect of

---

[8] New York also asserts that Holtec is required to adduce, but has not, "[any] evidence that its disposal decision has any effect on or nexus to radiological safety." (Def's Reply 5.) This argument is baffling. Can New York's argument really be that Holtec has failed to demonstrate that its decision to dispose of water irradiated by proximity to nuclear fission and containing a "radioactive isotope of hydrogen that cannot practically be removed," (Pl's 56.1 ¶ 25), is one that concerns radiological safety? In any case, New York does not dispute that the tritiated water is radioactive and that tritiated water has been discharged from Indian Point into

"trumping [NRC] decision-making with respect to the . . . disposal of AEA radionucilides," thereby representing a direct and substantial effect that warrants preemption. *Manning*, 527 F.3d at 840 n.10.

New York makes a number of arguments to the contrary. None is availing. New York first argues that Holtec "has not met its burden to plead or show that the [Statute] will have a substantial effect on nuclear safety." (Def's Opp. 18.) But this is not the test. The substantial effect is not on nuclear safety, but on "decisions . . . concerning radiological safety levels." *English*, 496 U.S. at 85. In effect, New York argues that if an entity regulated and licensed by the NRC is in compliance with regulations as they pertain to nuclear safety, only state laws that would require the entity to violate those regulations could be subject to preemption. New York makes this argument in relation to Holtec's field preemption argument, *see* infra n.8, but it sounds in conflict preemption, which the Court does not reach.

New York also argues that Holtec "has not alleged or shown that there is an absence of alternatives to [complying with the Discharge Statute]," or that "any [other] option for disposing of Indian Point's effluent would exceed the 25 millirem safety limit or is otherwise unsafe." (Def's Opp. 18.) But Holtec need not show an absence of alternatives; rather, it must show that the Discharge Statute impacts decisions concerning radiological safety levels, which it has done. (*See* Pl's 56.1 ¶¶ 57–58.) *Cf. Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223,

---

the Hudson River. (Def's 56.1 Resp. ¶¶ 25, 28; Def's 56.1 ¶ 9 (asserting that the discharge of tritiated water, i.e., "Indian Point effluent" causes "de minimis" "radiological exposure").) Finally, New York even acknowledges that disposal decisions implicate public health and safety. (*See* Def's 56.1 Resp. ¶ 59 (Holtec asserts that disposal alternatives "may be less protective of public health and safety than the discharge of the tritiated water to the Hudson River," and New York disputes this, stating in response: "All of the alternatives are full protective of public health and safety . . . .").) In short, Holtec has made a sufficient showing that its disposal decision has a direct effect on radiological safety.

1246 (10th Cir. 2004) (rejecting defendant's argument that "*Pacific Gas*, *Silkwood*, and *English* . . . turn the preemption inquiry upon a precise determination of costs imposed upon the operators of nuclear facilities by the application of the state law."). Rather, it is enough that foreclosing disposal of tritiated water via the Hudson River requires Holtec to investigate alternative methods of disposal, choose one, ensure compliance with NRC regulations, and then execute on its choice. The chain of events that the Discharge Statute necessarily sets off clearly has a direct and substantial effect on those operating nuclear facilities.[9] Accordingly, the Court finds that the Discharge Statute is preempted.

2. New York's Counterclaim

New York cross-moved for summary judgment on Holtec's liability under the Discharge Statute and for declaratory judgment that Holtec has violated the Statute. (*See* Cross Not. of Mot. 2.) The Court has found the Discharge Statute preempted. *See* supra Section II.B.1.b. "Under the doctrine of federal preemption, 'state and local laws that conflict with federal law are without effect.'" *Art & Antique Dealers League of Am., Inc. v. Seggos*, 121 F.4th 423, 428 (2d Cir. 2024) (quoting *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 103–04 (2d Cir. 2010)). Given that the Discharge Statute is without effect, the Court denies New York's Cross-Motion. *See Williams v. Murphy*, No. 13-CV-1154, 2018 WL 2016850, at *17 (D. Conn. Mar. 29, 2018) (finding that its grant of summary judgment on the ground of preemption was "dispositive" of other pending motions, which the court denied as moot), *aff'd sub nom. Williams v. Marinelli*, 987 F.3d 188 (2d Cir. 2021).

[9] Because the Court finds that the Discharge Statute is field preempted, it does not reach the Parties' arguments as they relate to conflict preemption.

III. Conclusion

For the reasons set forth above, Holtec's Motion is granted and New York's Cross-Motion is denied. The Clerk of the Court is respectfully directed to terminate the pending motion flags at Dkt. Nos. 28 and 33. The Court will hold a conference on October 9, 2025, at 3:00 PM. Dial-in information can be found in the Court's Individual Rules.

SO ORDERED.

Dated: September 24, 2025
White Plains, New York

KENNETH M. KARAS
United States District Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

HOLTEC INTERNATIONAL,
HOLTEC INDIAN POINT 2, LLC,
HOLTEC INDIAN POINT 3, LLC and
HOLTEC DECOMMISSIONING
INTERNATIONAL, LLC,

Plaintiffs,

– against –

THE STATE OF NEW YORK,

Defendant.

Case No. 7:24-cv-02929-KMK

~~[PROPOSED]~~ FINAL JUDGMENT

WHEREAS, Plaintiffs commenced this action by filing a complaint on April 18, 2024 (the "Complaint"); and

WHEREAS, Defendant filed an amended answer and counterclaim on July 2, 2024 (the "Amended Answer"); and

WHEREAS, Plaintiffs moved for summary judgment in their favor on Count One of the Complaint and Count One of the Amended Answer pursuant to Rule 56 of the Federal Rules of Civil Procedure on October 7, 2024; and

WHEREAS, Defendant cross moved for summary judgment in its favor on Count One of the Complaint and Count One of the Amended Answer pursuant to Rule 56 of the Federal Rules of Civil Procedure on November 8, 2024; and

WHEREAS, an Order and Opinion of the Honorable Kenneth M. Karas, United States District Judge, was entered on September 24, 2025, granting Plaintiffs' motion and denying Defendant's cross motion;

IT IS HEREBY ORDERED, ADJUDGED and DECREED that:

1. Plaintiffs' motion for summary judgment in their favor on Count One of the Complaint and Count One of the Amended Answer is GRANTED;

2. Defendant's cross motion for summary judgment in its favor on Count One of the Complaint and Count One of the Amended Answer is DENIED;

3. New York State Environmental Conservation Law § 30-0103 (eff. August 18, 2023) is preempted by federal law and unconstitutional pursuant to the Supremacy Clause of the U.S. Constitution and 28 U.S.C. § 2201 as applied to Plaintiffs and their officers and employees; and

4. The parties shall adhere to the terms of the so-ordered stipulation annexed hereto as Appendix A through the date of disposition of any timely appeal from this Final Judgment to the United States Court of Appeals for the Second Circuit.

The Clerk is hereby directed to enter Final Judgment and close this action forthwith.

**Dated:** 10/17/25

KENNETH M. KARAS
U.S. District Judge

# APPENDIX A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

HOLTEC INTERNATIONAL, HOLTEC INDIAN POINT 2, LLC, HOLTEC INDIAN POINT 3, LLC and HOLTEC DECOMMISSIONING INTERNATIONAL, LLC,

Plaintiffs,

– against –

THE STATE OF NEW YORK,

Defendant.

Case No. 7:24-cv-02929-KMK

**STIPULATION AND ORDER**

**IT IS STIPULATED AND AGREED** by and between the undersigned parties that:

1. This stipulation shall be in effect through the disposition of any appeal to the United States Court of Appeals for the Second Circuit from the final judgment of this Court arising from the Order & Opinion dated September 24, 2025 (ECF No. 48).

2. Plaintiffs Holtec International, Holtec Indian Point 2, LLC, Holtec Indian Point 3, LLC, and Holtec Decommissioning International, LLC (together, "Holtec") hereby agree that Holtec will not discharge wastewater held in the spent fuel pools and reactor cavities at Units 2 and 3 of the Indian Point nuclear facility into the Hudson River without providing defendant State of New York (the "State") with at least 30 days' advance notice of an intent to do so.

3. Holtec further agrees that it will not pursue any discharge of the wastewater referenced in paragraph 2 into the Hudson River during the period between May 1 and September 30 of any calendar year.

4. The State will not at this time seek an injunction against Holtec to prevent the discharges referenced in paragraph 2.

5. The State reserves its right to move this Court and/or an appellate court of competent jurisdiction for an injunction or other relief to prevent any discharge of wastewater as described in paragraph 2 pending resolution of the State's appeal if Holtec informs the State of an intent to discharge, or if the State otherwise learns that a discharge is ongoing or imminent.

Dated: October 16, 2025

THE STATE OF NEW YORK

By: /s/ Channing Wistar-Jones

Channing Wistar-Jones
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005

Dated: October 16, 2025

HOLTEC INTERNATIONAL, HOLTEC INDIAN POINT 2, LLC, HOLTEC INDIAN POINT 3, LLC and HOLTEC DECOMMISSIONING INTERNATIONAL, LLC

By: ______________

James M. Catterson
Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street
New York, NY 10019-6131

**SO ORDERED:**

______________

KENNETH M. KARAS

U.S. District Judge
10/17/25

McKinney's Consolidated Laws of New York Annotated
Environmental Conservation Law (Refs & Annos)
Chapter 43-B. Of the Consolidated Laws (Refs & Annos)
Article 30. Decommissioning Nuclear Power Plant Discharges into the Hudson River

McKinney's ECL § 30-101

§ 30-101. [1] Legislative findings

Effective: August 18, 2023
Currentness

1. The legislature finds that while the energy and economic output generated by nuclear power plants are beneficial to the state and its residents, discharges into waters of the state of radiological agents from nuclear power plants have various adverse and substantial economic impacts on the state and its residents.

2. The legislature further finds that communities with interests in the Hudson River are concerned with the economic impacts on local real estate values and economic development with respect to the discharge of waste from nuclear power plants into waters of the state during plant decommissioning, which effect is no longer balanced by countervailing economic benefits of the plant to those communities that the plant provided during operation.

3. The legislature further finds that other methods of managing waste from decommissioning nuclear power plants are available and would not result in the same economic impacts.

4. The legislature therefore finds and declares that it is the duty of the state to act to preserve the economic vitality of affected communities.

**Credits**
(Added L.2023, c. 279, § 1, eff. Aug. 18, 2023.)

**Footnotes**

1 So in original. Probably should be § 30-0101.

McKinney's E. C. L. § 30-101, NY ENVIR CONSER § 30-101
Current through L.2025 chapters 1 to 713. Some statute sections may be more current, see credits for details.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag
Unconstitutional or Preempted Preempted by Holtec International v. New York, S.D.N.Y., Sep. 24, 2025

McKinney's Consolidated Laws of New York Annotated
Environmental Conservation Law (Refs & Annos)
Chapter 43-B. Of the Consolidated Laws (Refs & Annos)
Article 30. Decommissioning Nuclear Power Plant Discharges into the Hudson River

McKinney's ECL § 30-0103

§ 30-0103. Unlawful discharges

Effective: August 18, 2023
Currentness

To the extent not subject to preemption by federal law, and notwithstanding any other state or local law, rule, or regulation to the contrary, it shall be unlawful to discharge any radiological substance into the Hudson River in connection with the decommissioning of a nuclear power plant.

**Credits**
(Added L.2023, c. 279, § 1, eff. Aug. 18, 2023.)

**Editors' Notes**

**VALIDITY**

<For validity of this section, see Holtec Int'l v. New York, ___ F.Supp.3d ___, 2025 WL 2721020 (S.D.N.Y. 2025). >

McKinney's E. C. L. § 30-0103, NY ENVIR CONSER § 30-0103
Current through L.2025 chapters 1 to 713. Some statute sections may be more current, see credits for details.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
Title 42. The Public Health and Welfare
Chapter 23. Development and Control of Atomic Energy (Refs & Annos)
Division a. Atomic Energy
Subchapter I. General Provisions

42 U.S.C.A. § 2021

§ 2021. Cooperation with States

Effective: August 8, 2005
Currentness

**(a) Purpose**

It is the purpose of this section--

**(1)** to recognize the interests of the States in the peaceful uses of atomic energy, and to clarify the respective responsibilities under this chapter of the States and the Commission with respect to the regulation of byproduct, source, and special nuclear materials;

**(2)** to recognize the need, and establish programs for, cooperation between the States and the Commission with respect to control of radiation hazards associated with use of such materials;

**(3)** to promote an orderly regulatory pattern between the Commission and State governments with respect to nuclear development and use and regulation of byproduct, source, and special nuclear materials;

**(4)** to establish procedures and criteria for discontinuance of certain of the Commission's regulatory responsibilities with respect to byproduct, source, and special nuclear materials, and the assumption thereof by the States;

**(5)** to provide for coordination of the development of radiation standards for the guidance of Federal agencies and cooperation with the States; and

**(6)** to recognize that, as the States improve their capabilities to regulate effectively such materials, additional legislation may be desirable.

**(b) Agreements with States**

Except as provided in subsection (c), the Commission is authorized to enter into agreements with the Governor of any State providing for discontinuance of the regulatory authority of the Commission under subchapters V, VI, and VII of this division, and section 2201 of this title, with respect to any one or more of the following materials within the State:

**(1)** Byproduct materials (as defined in section 2014(e) of this title).

**(2)** Source materials.

**(3)** Special nuclear materials in quantities not sufficient to form a critical mass.

During the duration of such an agreement it is recognized that the State shall have authority to regulate the materials covered by the agreement for the protection of the public health and safety from radiation hazards.

**(c) Commission regulation of certain activities**

No agreement entered into pursuant to subsection (b) shall provide for discontinuance of any authority and the Commission shall retain authority and responsibility with respect to regulation of--

**(1)** the construction and operation of any production or utilization facility or any uranium enrichment facility;

**(2)** the export from or import into the United States of byproduct, source, or special nuclear material, or of any production or utilization facility;

**(3)** the disposal into the ocean or sea of byproduct, source, or special nuclear waste materials as defined in regulations or orders of the Commission;

**(4)** the disposal of such other byproduct, source, or special nuclear material as the Commission determines by regulation or order should, because of the hazards or potential hazards thereof, not be so disposed of without a license from the Commission.

The Commission shall also retain authority under any such agreement to make a determination that all applicable standards and requirements have been met prior to termination of a license for byproduct material, as defined in section 2014(e)(2) of this title. Notwithstanding any agreement between the Commission and any State pursuant to subsection (b), the Commission is authorized by rule, regulation, or order to require that the manufacturer, processor, or producer of any equipment, device, commodity, or other product containing source, byproduct, or special nuclear material shall not transfer possession or control of such product except pursuant to a license issued by the Commission.

**(d) Conditions**

The Commission shall enter into an agreement under subsection (b) of this section with any State if--

**(1)** The [1] Governor of that State certifies that the State has a program for the control of radiation hazards adequate to protect the public health and safety with respect to the materials within the State covered by the proposed agreement, and that the State desires to assume regulatory responsibility for such materials; and

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**(2)** the Commission finds that the State program is in accordance with the requirements of subsection (o) and in all other respects compatible with the Commission's program for the regulation of such materials, and that the State program is adequate to protect the public health and safety with respect to the materials covered by the proposed agreement.

**(e) Publication in Federal Register; comment of interested persons**

**(1)** Before any agreement under subsection (b) is signed by the Commission, the terms of the proposed agreement and of proposed exemptions pursuant to subsection (f) shall be published once each week for four consecutive weeks in the Federal Register; and such opportunity for comment by interested persons on the proposed agreement and exemptions shall be allowed as the Commission determines by regulation or order to be appropriate.

**(2)** Each proposed agreement shall include the proposed effective date of such proposed agreement or exemptions. The agreement and exemptions shall be published in the Federal Register within thirty days after signature by the Commission and the Governor.

**(f) Exemptions**

The Commission is authorized and directed, by regulation or order, to grant such exemptions from the licensing requirements contained in subchapters V, VI, and VII, and from its regulations applicable to licensees as the Commission finds necessary or appropriate to carry out any agreement entered into pursuant to subsection (b) of this section.

**(g) Compatible radiation standards**

The Commission is authorized and directed to cooperate with the States in the formulation of standards for protection against hazards of radiation to assure that State and Commission programs for protection against hazards of radiation will be coordinated and compatible.

**(h) Consultative, advisory, and miscellaneous functions of Administrator of Environmental Protection Agency**

The Administrator of the Environmental Protection Agency shall consult qualified scientists and experts in radiation matters, including the President of the National Academy of Sciences, the Chairman of the National Committee on Radiation Protection and Measurement, and qualified experts in the field of biology and medicine and in the field of health physics. The Special Assistant to the President for Science and Technology, or his designee, is authorized to attend meetings with, participate in the deliberations of, and to advise the Administrator. The Administrator shall advise the President with respect to radiation matters, directly or indirectly affecting health, including guidance for all Federal agencies in the formulation of radiation standards and in the establishment and execution of programs of cooperation with States. The Administrator shall also perform such other functions as the President may assign to him by Executive order.

**(i) Inspections and other functions; training and other assistance**

The Commission in carrying out its licensing and regulatory responsibilities under this chapter is authorized to enter into agreements with any State, or group of States, to perform inspections or other functions on a cooperative basis as the Commission deems appropriate. The Commission is also authorized to provide training, with or without charge, to employees of, and such

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

other assistance to, any State or political subdivision thereof or group of States as the Commission deems appropriate. Any such provision or assistance by the Commission shall take into account the additional expenses that may be incurred by a State as a consequence of the State's entering into an agreement with the Commission pursuant to subsection (b).

**(j) Reserve power to terminate or suspend agreements; emergency situations; State nonaction on causes of danger; authority exercisable only during emergency and commensurate with danger**

**(1)** The Commission, upon its own initiative after reasonable notice and opportunity for hearing to the State with which an agreement under subsection (b) has become effective, or upon request of the Governor of such State, may terminate or suspend all or part of its agreement with the State and reassert the licensing and regulatory authority vested in it under this chapter, if the Commission finds that (1) such termination or suspension is required to protect the public health and safety, or (2) the State has not complied with one or more of the requirements of this section. The Commission shall periodically review such agreements and actions taken by the States under the agreements to ensure compliance with the provisions of this section.

**(2)** The Commission, upon its own motion or upon request of the Governor of any State, may, after notifying the Governor, temporarily suspend all or part of its agreement with the State without notice or hearing if, in the judgment of the Commission:

**(A)** an emergency situation exists with respect to any material covered by such an agreement creating danger which requires immediate action to protect the health or safety of persons either within or outside the State, and

**(B)** the State has failed to take steps necessary to contain or eliminate the cause of the danger within a reasonable time after the situation arose.

A temporary suspension under this paragraph shall remain in effect only for such time as the emergency situation exists and shall authorize the Commission to exercise its authority only to the extent necessary to contain or eliminate the danger.

**(k) State regulation of activities for certain purposes**

Nothing in this section shall be construed to affect the authority of any State or local agency to regulate activities for purposes other than protection against radiation hazards.

**(l) Commission regulated activities; notice of filing; hearing**

With respect to each application for Commission license authorizing an activity as to which the Commission's authority is continued pursuant to subsection (c), the Commission shall give prompt notice to the State or States in which the activity will be conducted of the filing of the license application; and shall afford reasonable opportunity for State representatives to offer evidence, interrogate witnesses, and advise the Commission as to the application without requiring such representatives to take a position for or against the granting of the application.

**(m) Limitation of agreements and exemptions**

No agreement entered into under subsection (b), and no exemption granted pursuant to subsection (f), shall affect the authority of the Commission under section 2201(b) or (i) of this title to issue rules, regulations, or orders to protect the common defense

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

and security, to protect restricted data or to guard against the loss or diversion of special nuclear material. For purposes of section 2201(i) of this title, activities covered by exemptions granted pursuant to subsection (f) shall be deemed to constitute activities authorized pursuant to this chapter; and special nuclear material acquired by any person pursuant to such an exemption shall be deemed to have been acquired pursuant to section 2073 of this title.

(n) "State" and "agreement" defined

As used in this section, the term "State" means any State, Territory, or possession of the United States, the Canal Zone, Puerto Rico, and the District of Columbia. As used in this section, the term "agreement" includes any amendment to any agreement.

**(o) State compliance requirements: compliance with section 2113(b) of this title and health and environmental protection standards; procedures for licenses, rulemaking, and license impact analysis; amendment of agreements for transfer of State collected funds; proceedings duplication restriction; alternative requirements**

In the licensing and regulation of byproduct material, as defined in section 2014(e)(2) of this title, or of any activity which results in the production of byproduct material as so defined under an agreement entered into pursuant to subsection (b), a State shall require--

**(1)** compliance with the requirements of subsection (b) of section 2113 of this title (respecting ownership of byproduct material and land), and

**(2)** compliance with standards which shall be adopted by the State for the protection of the public health, safety, and the environment from hazards associated with such material which are equivalent, to the extent practicable, or more stringent than, standards adopted and enforced by the Commission for the same purpose, including requirements and standards promulgated by the Commission and the Administrator of the Environmental Protection Agency pursuant to sections 2113, 2114, and 2022 of this title, and

**(3)** procedures which--

**(A)** in the case of licenses, provide procedures under State law which include--

**(i)** an opportunity, after public notice, for written comments and a public hearing, with a transcript,

**(ii)** an opportunity for cross examination, and

**(iii)** a written determination which is based upon findings included in such determination and upon the evidence presented during the public comment period and which is subject to judicial review;

**(B)** in the case of rulemaking, provide an opportunity for public participation through written comments or a public hearing and provide for judicial review of the rule;

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**(C)** require for each license which has a significant impact on the human environment a written analysis (which shall be available to the public before the commencement of any such proceedings) of the impact of such license, including any activities conducted pursuant thereto, on the environment, which analysis shall include--

**(i)** an assessment of the radiological and nonradiological impacts to the public health of the activities to be conducted pursuant to such license;

**(ii)** an assessment of any impact on any waterway and groundwater resulting from such activities;

**(iii)** consideration of alternatives, including alternative sites and engineering methods, to the activities to be conducted pursuant to such license; and

**(iv)** consideration of the long-term impacts, including decommissioning, decontamination, and reclamation impacts, associated with activities to be conducted pursuant to such license, including the management of any byproduct material, as defined by section 2014(e)(2) of this title; and

**(D)** prohibit any major construction activity with respect to such material prior to complying with the provisions of subparagraph (C).

If any State under such agreement imposes upon any licensee any requirement for the payment of funds to such State for the reclamation or long-term maintenance and monitoring of such material, and if transfer to the United States of such material is required in accordance with section 2113(b) of this title, such agreement shall be amended by the Commission to provide that such State shall transfer to the United States upon termination of the license issued to such licensee the total amount collected by such State from such licensee for such purpose. If such payments are required, they must be sufficient to ensure compliance with the standards established by the Commission pursuant to section 2201(x) of this title. No State shall be required under paragraph (3) to conduct proceedings concerning any license or regulation which would duplicate proceedings conducted by the Commission. In adopting requirements pursuant to paragraph (2) of this subsection with respect to sites at which ores are processed primarily for their source material content or which are used for the disposal of byproduct material as defined in section 2014(e)(2) of this title, the State may adopt alternatives (including, where appropriate, site-specific alternatives) to the requirements adopted and enforced by the Commission for the same purpose if, after notice and opportunity for public hearing, the Commission determines that such alternatives will achieve a level of stabilization and containment of the sites concerned, and a level of protection for public health, safety, and the environment from radiological and nonradiological hazards associated with such sites, which is equivalent to, to the extent practicable, or more stringent than the level which would be achieved by standards and requirements adopted and enforced by the Commission for the same purpose and any final standards promulgated by the Administrator of the Environmental Protection Agency in accordance with section 2022 of this title. Such alternative State requirements may take into account local or regional conditions, including geology, topography, hydrology and meteorology.

**CREDIT(S)**

(Aug. 1, 1946, c. 724, Title I, § 274, as added Pub.L. 86-373, § 1, Sept. 23, 1959, 73 Stat. 688; amended 1970 Reorg. Plan No. 3, §§ 2(a)(7), 6(2), eff. Dec. 2, 1970, 35 F.R. 15623, 84 Stat. 2086; Pub.L. 95-604, Title II, § 204(a)-(e)(1), (f), Nov. 8, 1978, 92 Stat. 3036-3038; Pub.L. 96-295, Title II, § 205, June 30, 1980, 94 Stat. 787; Pub.L. 97-415, § 19(a), Jan. 4, 1983, 96

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Stat. 2078; renumbered Title I and amended Pub.L. 102-486, Title IX, § 902(a)(6), (8), Oct. 24, 1992, 106 Stat. 2944; Pub.L. 109-58, Title VI, § 651(e)(2), Aug. 8, 2005, 119 Stat. 807.)

## EXECUTIVE ORDERS

### EXECUTIVE ORDER NO. 12192

Ex. Ord. No. 12192, Feb. 12, 1980, 45 F.R. 9727, which established the State Planning Council on Radioactive Waste Management and provided for its membership, functions, etc., was revoked by Ex. Ord. No. 12379, § 13, Aug. 17, 1982, 47 F.R. 36099, formerly set out as a note under 5 U.S.C.A. § 1013.

Notes of Decisions (31)

## Footnotes

1 So in original. Probably should read "the".

42 U.S.C.A. § 2021, 42 USCA § 2021
Current through P.L. 119-59. Some statute sections may be more current, see credits for details.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
Constitution of the United States
Annotated
Article VI. Debts Validated--Supreme Law of Land--Oath of Office

U.S.C.A. Const. Art. VI cl. 2

Clause 2. Supreme Law of Land

Currentness

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

Notes of Decisions (2323)

U.S.C.A. Const. Art. VI cl. 2, USCA CONST Art. VI cl. 2
Current through P.L. 119-59. Some statute sections may be more current, see credits for details.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.